**BRUCE ARISTEO,** *pro se*
1640 Nixon Drive
Suite 272
Moorestown NJ, 08057
Phone: (856) 437-0778
Fax:    (866) 629-3666
Email: brucearisteo@gmail.com

|  |  |
|---|---|
| BRUCE ARISTEO,<br><br>Plaintiff *pro se*,<br><br>v.<br><br>JODY RAINES; WEBMARCOM LLC;<br>MICHELE MOKEN; DEBORAH FERGUSON;<br>JOSEPH COLOZZI; JUDITH WESCOAT;<br>and/or JOHN/JANE DOE 1-10,<br><br>Defendants. | **UNITED STATES DISTRICT COURT<br>DISTRICT OF NEW JERSEY<br>CAMDEN VICINAGE**<br><br>**CIVIL ACTION<br>No.**<br><br>**COMPLAINT<br>WITH JURY DEMAND** |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Bruce Aristeo, acting *pro se*, complains of Defendants as follows and demands a jury trial pursuant to Fed. R. Civ. P. 38 and 39:

## I. INTRODUCTION

1.     This case stems from the theft of Intellectual Property, the interference of civil liberty, gender discrimination, and the right to be free from prosecution for protected forms of self-expression. Plaintiff Bruce Aristeo charges a conspiracy to violate and the violation of his fundamental rights and liberty as secured by the United States Constitution, and brings his action pursuant to federal statutes and regulations, and the laws and constitution of the State of New Jersey. Mr. Aristeo calls upon his rights as a crime victim, and seeks declaratory and injunctive relief and monetary damages.

2.     On diverse dates from December 2012 and thereafter, the conduct of Defendants Jody Raines, Michele Moken, Deborah Ferguson, Joseph Colozzi, Judith Wescoat, and/or John/Jane Doe 1-10, individually and jointly, willfully, engaged in conduct any reasonable person would consider outrageous and beyond all possible bounds of decency. Their conduct includes, but is not limited to, the theft and destruction of property, inter/intra-state intimidation, online dissemination of private information, abuse of process, false imprisonment, and conspiracy to extort the fundamental rights and individual liberties of Plaintiff Bruce Aristeo.

3.     While Plaintiff Bruce Aristeo can never regain his property, the time in defending his rights, or the 190 days of his life he lost in jail, this civil action will allow him to be compensated for the loss of liberty and the emotional and financial trauma inflicted upon him.

4.     Conduct prior to December 2012 is complained of for reasons that: (1) the conduct is within actionable time limitations, (2) the conduct is a continuous, or (3) the conduct is fraud wherefore the wrongful acts prevented Plaintiff Bruce Aristeo from asserting his claims.

## II. JURISDICTION

5.     This Court has original jurisdiction over claims arising from the Constitution of the United States, and Title 42 U.S.C. § 1985 and 1986.

6.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.

7.     This Court has original jurisdiction for the enforcement of regulations and claims arising from The Federal Trade Commissions Act pursuant to Title 15 U.S.C. § 1681p; The Copyright Act pursuant to Title 17 U.S.C.; The Privacy of Consumer Financial Information pursuant to Title 17 C.F.R.; The Telecommunications Act pursuant to Title 47 U.S.C. § 223; and The Federal-State Unemployment Compensation Act.

### III. VENUE

8.      Venue is proper in this District pursuant to 28 U.S.C. § 1391, on the grounds that the events set forth herein occurred in this District.

9.      There is an actual controversy between Plaintiff and Defendants within the meaning of the Declaratory Judgment Act 28 U.S.C. et seq., and Fed. R. Civ. P. 57.

### IV. PARTIES

10.     Plaintiff Bruce Aristeo ("Mr. Aristeo") is and at all relevant times an adult citizen who resides in Burlington County, the State of New Jersey.

11.     Defendant Jody Raines ("Raines") is and at all relevant times of the events complained of herein an adult citizen residing in Camden County, the State of New Jersey. To that end, Defendant Raines is sued in her individual capacity.

12.     Defendant Webmarcom LLC ("Webmarcom") a business entity owned and operated by Raines at her home address of 3 Bradford Way Township of Voorhees, Camden County, New Jersey. To that end, Defendant Webmarcom is sued in its individual capacity.

13.     Defendant Michele Moken ("Moken") is and at all relevant times of the events complained of herein an adult citizen residing in Camden County, the State of New Jersey. To that end, Defendant Moken is sued in her individual capacity.

14.     Defendant Deborah Ferguson ("Ferguson") is and at all relevant times of the events complained of herein an adult citizen residing in Burlington County, the State of New Jersey. To that end, Defendant Ferguson is sued in her individual capacity.

15.     Defendant Joseph Colozzi ("Colozzi") is and at all relevant times of the events complained of herein an adult citizen residing in New Providence, the State of Pennsylvania. To that end, Defendant Colozzi is sued in his individual capacity.

16.     Defendant Judith Wescoat ("Wescoat") is and at all relevant times of the events complained of herein an adult citizen residing in Salem County, the State of New Jersey. To that end, Defendant Wescoat is sued in her individual capacity.

17.     Defendants John/Jane Doe 1-10 ("Doe 1-10") is a fictitious designation for a person or business entity or agent, servant or assignee thereof whose act or failure to act caused damages to Mr. Aristeo as set forth herein.

18.     Defendants Raines, Moken, Ferguson, Colozzi, Wescoat, and/or Doe 1-10 jointly are known herein as "DEFENDANTS."

## V. **FACTUAL BACKGROUND**

19.     On November 5, 2010, Mr. Aristeo and the Defendant Raines entered into a monogamous dating relationship with one another.

20.     On or about November 12, 2010, Defendant Raines sent various electronic transmissions to Mr. Aristeo offering monetary payments for work on various digital projects.

21.     At all times relevant Defendant Raines publicly broadcast that she alone was the controller of Webmarcom LLC, and an authority on the subjects of Internet Marketing.

22.     Defendant Raines demonstrated her skills through speaking seminars, blogging, and video-blogs, also known as podcasts or vlogs (video blogs).

23.     On February 4, 2011, Mr. Aristeo ended the dating relationship with Defendant Raines for reasons of unexpected stressors brought about by her former husband's Final Judgment of Divorce (complaint Docket No. FM-04-1949-99).

24.     Regardless of ending the personal relationship, Mr. Aristeo continued working on unfinished Internet projects for Defendants Raines and Webmarcom, and/or Doe 1-10.

4

25.    On February 28, 2011, Defendants Raines and Webmarcom, and/or Doe 1-10 breached her/their contract by failing to compensate Mr. Aristeo for completed work projects, and she/they profited from his advises and Intellectual Property. The failure to compensate Mr. Aristeo became the foundation of a lawsuit against Raines and Webmarcom, and Doe 1-10.

26.    On or about March 8, 2011, Defendant Raines submitted reports to the New Jersey Department of Labor and Workforce falsely alleging Mr. Aristeo's employment status. As a result, Mr. Aristeo's benefits were terminated and caused him severe financial hardship.

27.    On March 28, 2011, Defendant Raines provided law-enforcement with knowingly false and misleading information implicating Mr. Aristeo for acts of domestic violence.

28.    On diverse dates between April 1, 2011 and January 2, 2014, Defendants Raines, Ferguson, and/or Doe 1-10 obtained Mr. Aristeo's personal and private information and unreasonably disseminated his information publicly at business events and over the Internet.

29.    On diverse dates between March 29, 2011 and January 2, 2014, the DEFENDANTS individually and jointly, willfully, created a "false light" upon Mr. Aristeo that interfered with his economic liberty and basic right to associate with public community groups.

30.    On diverse dates between January 2012 and November 2014, Mr. Aristeo applied to multiple New Jersey Criminal Justice agencies, but the DEFENDANTS' conduct was such that it caused gender discrimination and the denial of equal protection of the laws.

31.    On November 5, 2012, Mr. Aristeo presented his grievances online using both his personal websites and social media accounts, the contents of which demonstrated the conduct of DEFENDANTS and the discrimination exhibited by criminal justice officers.

32.    On April 10, 2013, Mr. Aristeo created a personal website and videos that parodied the "false light" DEFENDANTS cast upon him.

33.     Displeased with the content of Mr. Aristeo's personal online accounts, the DEFENDANTS acted, individually and jointly, with officers of the Camden County Office of the Prosecutor, and embarked on a strategy to shut down Mr. Aristeo's online accounts and punish him for publicly expressing himself.

34.     The DEFENDANTS willfully participated in the unlawful conduct described herein which caused the deprivation of Mr. Aristeo's protected rights and individual liberty, acted in concert with other Defendants who participated in or acquiesced to the unlawful conduct, failed to intervene or stop other Defendants from engaging in the unlawful conduct while possessing the power to do so, or knew of and condoned the unlawful conduct.

35.     DEFENDANTS acted knowingly and intentionally, willfully, or with reckless or callous disregard for, or with deliberate indifference to Mr. Aristeo's rights and liberty.

36.     DEFENDANTS' unlawful conduct described herein directly and proximately caused Mr. Aristeo significant emotional distress, a loss of appetite, insomnia, anxiety, discomfort, damage to his reputation, financial hardship, loss of property, and indigence.

37.     DEFENDANTS' unlawful conduct described herein directly and proximately caused Mr. Aristeo the loss of opportunity to engage in expression during the period he was incarcerated and when his computer, cell phone and other electronic devices were confiscated.

38.     Because DEFENDANTS and law-enforcement continue to maintain publicly that the actions taken against Mr. Aristeo were lawful and proper, Mr. Aristeo remains in danger of being punished for exercising his right to defend himself, his liberties, and freedom of expression if he engages in the future in speech that is or is not derogatory towards the Defendants.

39.     Mr. Aristeo and the online accounts under his control continue to be monitored by DEFENDANTS and law-enforcement preserving his fear of retaliation and irreparable injury.

He is currently under Court Order not to express his opinions online, either directly or indirectly, regarding his personal experiences and/or grievances about the criminal justice system.

## VI. CONCLUSION

40.    Mr. Aristeo has no simple, adequate or complete remedy at law to redress the wrongs described herein. Mr. Aristeo has been and will continue to be irreparably injured by the loss of his property and the conduct of the DEFENDANTS. Mr. Aristeo wishes to be able to report, criticize, parody, satirize, and otherwise engage in humorous expression about his personal experiences in the future — including through the use of risqué language and symbolism — but is chilled from doing so because he objectively fears retaliation from DEFENDANTS through and by law-enforcement if he engages in such protected conduct.

## VII. CLAIMS RELIEF

### FIRST CLAIM FOR RELIEF
### INTELLECTUAL PROPERTY THEFT

41.    The allegations of paragraphs 1 through 40 are realleged and incorporated by reference as if fully set forth herein.

42.    The conduct described and reference herein is actionable pursuant to Article I, Section 8 of the United States Constitution, the Copyright Act, and Title 17 U.S.C § 102(a), 506, 504(c)(2); and N.J.S.A. 2C:20-3.

43.    Intellectual Property (herein as "Property") is defined as any product of the human intellect, typically characterized as non-rivalrous public goods, the law protects from unauthorized use. "Property" is anything of value, including but not limited to, information, data, and computer software, in human or computer readable form, copies or originals.

44.     The general contract of Defendants Raines and Webmarcom demonstrates the intended privileges of the Copyright Act 1976, and as set forth below in the "Print and New Media Design Trade Customs" attached to the Webmarcom contract as pages 5-6: [EXHIBIT A].

> "Until the designer transfers ownership rights, creative work remains the property of the designer.  There can be no use of the designer's work except upon compensation to be determined by the designer.  Purchase orders issued after the completion of creative work, claiming the clients ownership of creative work, are not valid unless agreed upon by both parties."

45.     On diverse dates between January 11, 2011 and February 28, 2011, Defendant Raines and Webmarcom, and/or Doe 1-10, subcontracted Mr. Aristeo at the agreed rate of $100-$125/hour to use his intellect and talent to make improvements to an existing website, and to create from scratch a new website (herein as "Project") for her/their client Pro Motion, Inc. (herein as "PMI"). [EXHIBIT B].

46.     According to the PMI website (www.promotion1.com), PMI is a Missouri registered company with address 18405 Edison Ave. Chesterfield, MO 63005, and all Property created for PMI by Mr. Aristeo were stored on servers and secured in password-protected accounts under the control and management of Defendant Raines.

47.     On diverse dates between February 28, 2011 and May 4, 2011, Defendant Raines removed Mr. Aristeo's notice of authorship, and released his Property to PMI, and profited from the transaction.

48.     Defendants Jody Raines and Webmarcom LLC and/or John/Jane Doe 1-10, individually or jointly, breached Copyright regulations and the rights of Mr. Aristeo by inducing him to create Intellectual Property, and then removing any notice of authorship and distributing said Property to an interstate customer(s) for compensation without Mr. Aristeo's authorization, or the agreed upon compensation for his time or the release of his ownership.

8

## SECOND CLAIM FOR RELIEF
## BREECH OF CONTRACT

49.     The allegations of paragraphs 1 through 48 are realleged and incorporated by reference as if fully set forth herein.

50.     The actions of the Defendants Jody Raines and Webmarcom LLC and/or John/Jane Doe 1-10, individually or jointly, described herein violate the rights of Mr. Aristeo to be free from deceit and any failure to comply, when there is a regulatory duty to comply, with contracts of which Mr. Aristeo is a named party to receive compensation.

## THIRD CLAIM FOR RELIEF
## UNJUST ENRICHMENT, QUANTUM MERUIT

51.     The allegations of paragraphs 1 through 50 are realleged and incorporated by reference as if fully set forth herein.

52.     The actions of the Defendants Jody Raines and Webmarcom LLC and/or John/Jane Doe 1-10 described herein constitute Unjust Enrichment by profiting from Mr. Aristeo's Intellectual Property without compensating him, therefore entitling Mr. Aristeo to full compensation for all of his Intellectual Property and advises rendered to Defendants Jody Raines and Webmarcom LLC, and/or John/Jane Doe 1-10, on the basis of *quantum meruit*.

## FOURTH CLAIM FOR RELIEF
## DESTRUCTION OF INTELLECTUAL PROPERTY

53.     The allegations of paragraphs 1 through 52 are realleged and incorporated by reference as if fully set forth herein.

54.     The conduct described and reference herein is actionable pursuant to the Copyright Act and sections under Title 17 U.S.C. as stated above including § 106A.

55.     "YouTube" is defined as a public video-sharing website owned by Google, Inc. headquartered in San Bruno, California.  YouTube offers the means for authors to upload and

9

share Intellectual Property in the form of digital graphics and/or audiovisual files (videos), and provides a proprietary media-player for viewing data through various electronic devices.

56.     Upon uploading Intellectual Property to YouTube owned servers, the author agrees to provide YouTube an exclusive copyright license. Accessing or viewing any YouTube data does not transfer the protected Rights to the user/viewer, and prohibits the user/viewer from copying or distributing in any medium any part of the Content. "Content" includes text, graphics, and videos a user may view on the Service. [EXHIBIT C].

57.     YouTube stresses that when using the Service, a viewer must understand and acknowledge that s/he may be exposed to Content that is inaccurate, offensive, indecent, or objectionable, and s/he "Agrees" to waive any legal or equitable rights or remedies.

58.     On diverse dates between November 2012 and May 2013, Defendant Raines complained to law-enforcement that Mr. Aristeo's freedom of expression — displayed on YouTube — caused her emotional distress. Raines had a duty to respect the YouTube "terms of service" and Copyright license, but violated the agreement by copying and distributing Mr. Aristeo's videos to others, and had destroyed Mr. Aristeo's Property and YouTube accounts.

59.     Defendant Jody Raines and/or John/Jane Doe 1-10, individually or jointly, breached Copyright regulations by causing the obstruction to, and destruction of, Mr. Aristeo's Intellectual Property and artistic works. As a result, Mr. Aristeo suffers from emotional distress and damages from the loss of sharing publicly his artistic creations and personal expression, and from the loss of the time and intellect in conceiving said creations.

### FIFTH CLAIM FOR RELIEF
### BREACH OF CONTRACT YOUTUBE TERMS OF SERVICE

60.     The allegations of paragraphs 1 through 59 are realleged and incorporated by reference as if fully set forth herein.

10

61. The actions of the Defendants Jody Raines and/or John/Jane Doe 1-10 described herein violate the rights of Mr. Aristeo to be free from a failure to comply with the agreed upon YouTube Terms of Service by employing law-enforcement to interfere with Mr. Aristeo for his expression of thought. As a result, Mr. Aristeo suffers emotional distress, and damages from loss of property and the expense of incarceration for exercising his First Amendment freedoms.

## SIXTH CLAIM FOR RELIEF
## INTERFERENCE WITH GOVERNMENT PROGRAM
### (Deprivation of Individual and Economic Liberty)

62. The allegations of paragraphs 1 through 61 are realleged and incorporated by reference as if fully set forth herein.

63. The conduct described and reference herein is actionable pursuant to Title 18 U.S. Code § 245(b)(1)(B), (E); N.J.R.S. 43:21-16(b)(1); and N.J.R.S. 43:21-16(d)(1).

64. The Unemployment Compensation Law is federally assisted and based on federal and state regulations approved through the Federal Unemployment Tax Act. It provides an unemployed person monetary payments while that person searches for a new job equivalent to the one lost without financial distress.

65. On or about March 1, 2011 through July 15, 2012, Defendant Raines made reports to the New Jersey Department of Labor and Workforce ("NJDLW"), and falsely alleged that Mr. Aristeo was employed beyond the limits of his determined benefits.

66. On or about March 27, 2013, Defendant Raines unknowingly provided Camden Prosecutors with documents from her computer that she originally sent to the NJDLW, of which are now in the possession of Mr. Aristeo. [EXHIBIT D].

67. The actions of the Defendant Jody Raines and/or John/Jane Doe 1-10 described herein violate the basic rights of Mr. Aristeo to receive government assistance without

11

interference by others. As a direct and proximate cause of the Interference to Mr. Aristeo's right to enjoy the benefits of "government assistance" by Defendant Jody Raines, Mr. Aristeo suffers damages and losses due to the forfeiture and liability of benefits totaling $44,000, the barring of any future federal or state government assistance, and the denial of his fundamental right to education, autonomy/self-reliance, economic freedom, and be free from financial hardship.

### SEVENTH CLAIM FOR RELIEF
### UNFAIR METHODS OF COMPETITION AND FREEDOM OF ASSOCIATION
**(Interference with Contractual Relations, False Light, Infliction of Emotional Distress)**

68.    The allegations of paragraphs 1 through 67 are realleged and incorporated by reference as if fully set forth herein.

69.    The conduct described and reference herein is actionable pursuant to Title 15 U.S. Code § 45(a)(1); § 52(a)(2); Title 18 U.S. Code § 1951(a); and Section 19 of the New Jersey State Constitution.

70.    On diverse dates between March 25, 2011 and January 25, 2012, Defendant Raines unfairly interfered with Mr. Aristeo's membership to public business networking organizations through solicited threatening and alarming interstate communications to and about Mr. Aristeo, employed the powers of law-enforcement to prohibit Mr. Aristeo from business events in the presence of other business minded individuals, and interfered with Mr. Aristeo's right to publicly associate with business minded individuals on social networks. [EXHIBIT E].

71.    On diverse dates between April 1, 2011 and June 2014, the Defendants Raines, Moken, Ferguson, and/or Doe 1-10 violated Mr. Aristeo's objective, legitimate, and reasonable expectation of privacy by publicly circulating, directly and indirectly, and through electronic devices, his federal and state protected personal information to various individuals and groups.

72.     On or about January 2012, Defendant Moken called and advised Ms. Toby Koch, a Rotary International officer, that if Mr. Aristeo were allowed to become a member of Twilight Rotary – a club of which neither Moken nor Raines belonged – then the Defendants Moken and Raines would disparage Twilight to ensure that other member prospects would not join.

73.     Defendants Jody Raines, Michele Moken, Deborah Ferguson, and/or John/Jane Doe 1-10 as described herein agreed among themselves and with other individuals to conspire to violate and violated Mr. Aristeo's basic rights and individual liberties enjoyed by every citizen to freely engage in such lawful business or occupation as he himself may choose without interference or obstruction by any other citizen.  As a direct and proximate result of the Invasion of Privacy and Tortious Interference to Mr. Aristeo's prospective advantage, pursuant to Federal Trade Commission regulations, the First Amendment, and the New Jersey State Constitution, Mr. Aristeo suffers damages and losses due to the denial of association in public community affairs, the demise of his business, and the defaming of groups of which he was a member.

## EIGHTH CLAIM FOR RELIEF
## HARASSING INTER/INTRA-STATE TELECOMMUNICATIONS

74.     The allegations of paragraphs 1 through 73 are realleged and incorporated by reference as if fully set forth herein.

75.     The conduct described and reference herein is actionable pursuant to Title 47 U.S.C. § 223(a)(1)(A); 18 U.S.C. § 875(d); and N.J.S.A. 2C:33-4(a), (c).

76.     The actions of Defendants Jody Raines and/or John/Jane Doe 1-10 as described herein violate the Federal Telecommunications Act and the basic rights of Mr. Aristeo to be free from harassing intrastate and/or interstate communications through a telecommunications device with the intent to intimidate.  As a direct and proximate result, Mr. Aristeo suffered emotional

distress that hindered his economic liberty and right to conduct business freely locally and online.

## EIGHTH CLAIM FOR RELIEF
## INVASION OF PRIVACY AND THE RIGHT TO BE SECURE
### (Unauthorized Seizure and Dissemination of Public and Non-public Personal Information)

77. The allegations of paragraphs 1 through 76 are realleged and incorporated by reference as if fully set forth herein.

78. The conduct described and reference herein is actionable pursuant to 15 U.S. Code § 1681p, § 1681n, § 1681o, § 1681r; and N.J.S.A. 2C:21-17.4 § 7(a), 6(a).

79. Pursuant to The American Law Institute - Restatement of the Law, Second, Torts, 652, privacy invasion is defined in pertinent part as:

"One who invades the right of privacy of another is subject to liability for the resulting harm to the interests of the other.

80. On April 1, 2011 through January 2, 2014, Defendants Ferguson, and/or Doe 1-10 compiled an "Investigative Consumer Report" regarding Mr. Aristeo without his knowledge or authorization to make such report. Ferguson was employed as a paralegal for the firm Intelysis Corp. Upon application, the firm provided a full-service corporate investigative report by compiling data from various nationwide sources for an applicant. [EXHIBIT F].

81. On April 4, 2011, Defendant Raines paid $262.15 for the investigative report on Mr. Aristeo, of which he did not authorize or make an application for its release.

82. Defendants Raines, Ferguson, and Moken publicly disseminated details of Mr. Aristeo's private life, directly and indirectly, via telephone, e-mail, social media, and to friends and associates, and leaders of business and community organizations.

14

83.   On June 12, 2013, Defendant Ferguson represented to Camden County detectives that "Jodie [sic] took my report on her own will and handed it to Toby suggesting that here's all the information that I hired Deb to find. Um, he's not good person." [EXHIBIT G].

84.   Defendants Jody Raines, Michele Moken, Deborah Ferguson, and/or John/Jane Doe 1-10 as described herein agreed among themselves and with other individuals to conspire to violate and violated the basic rights of Mr. Aristeo to be free from an invasion of privacy pursuant to the Fourth Amendment and federal and state privacy regulations, and as a direct proximate cause of their conduct, or lack thereof, Mr. Aristeo sustained serious injury upon his character, reputation, and interference to contractual business relationships.

### NINTH CLAIM FOR RELIEF
### SLANDER LIBEL

85.   The allegations of paragraphs 1 through 84 are realleged and incorporated by reference as if fully set forth herein.

86.   The conducts of individual DEFENDANTS as described herein violate the basic rights of Mr. Aristeo to be free from communications and writings imputing criminal conduct and/or harmful statements about his profession, business, or moral and ethical practices.

### TENTH CLAIM FOR RELIEF
### WRONGFUL INSTITUTION OF LEGAL PROCESS AND DETENTION
### (Conspiracy, False Arrest/Incarceration, Malicious Prosecution, Denial of Due Process)

87.   The allegations of paragraphs 1 through 86 are realleged and incorporated by reference as if fully set forth herein.

88.   A civil conspiracy is a combination of two or more persons acting in concert to commit an individual act. The principle elements of the conspiracy are an agreement between the parties to inflict a wrong against another, and an overt act that results in damage.

89. On diverse dates between March 28, 2011 and December 2014, the DEFENDANTS conspired to violate and violated Article I, Section 7 of the New Jersey Constitution, which prohibits the wrongful institution of legal process. Acting individually and jointly, DEFENDANTS — through their own actions — willfully provided government agencies with knowingly false and unsubstantiated information, and/or participated as witnesses supporting allegations that subjected Mr. Aristeo to pre-conviction malicious prosecution.

90. On the outset of May 2, 2011 through June 2012, Defendant Colozzi — who never met Mr. Aristeo — acted individually and jointly with Defendant Raines, and conducted himself in an official capacity as a police officer of Berlin Township, New Jersey. Defendant Colozzi falsely represented to law-enforcement and domestic violence advocates "Mr. Aristeo was harassing and stalking Raines," and opined Mr. Aristeo was dangerous. [EXHIBITS H].

91. On or about April 18, 2012, Defendant Raines acted jointly with Assistant Prosecutor Laurie A. Corson ("AP Corson") of the Camden County Office of the Prosecutor for the purpose of leveraging an advantage over Mr. Aristeo that would unjustly cause the premature termination of a Family Part civil litigation, thus infringing upon his right of due process.

92. On August 2, 2012, Mr. Aristeo's right to be equally protected was extorted through coercion and threats by compelling him to sign a civil agreement with Defendant Raines, which was rendered by the Hon. Nan S. Famular, J.S.C., Camden Superior Court. [EXHIBIT I].

93. The civil agreement provides in pertinent part that:

> "All Municipal Court actions against Bruce Aristeo are to be dismissed
> with prejudice including, but not limited to, matters presently pending in
> Burlington County. Ms. Raines will fully cooperate with the Prosecutor's
> Office with regard to the dismissal of the actions pending against Bruce
> Aristeo."

16

94.     On August 27, 2012, it was found that Defendant Raines deceived Mr. Aristeo and beached the August 2, 2012 civil agreement by providing all those involved with knowingly false information, of which is memorialized on the agreement. Since no Court actions ever existed against Mr. Aristeo, Raines can never comply with the agreement. [EXHIBIT J].

95.     On or about October 2012, Mr. Aristeo published his grievances online regarding nearly two years of frauds and injustices inflicted upon him by the DEFENDANTS and the New Jersey Criminal Justice system. Displeased with Mr. Aristeo's public display, DEFENDANTS collaborated with officers of the Camden Prosecutor's Office to silence Mr. Aristeo's speech.

96.     The DEFENDANTS provided law-enforcement with scripted and staged statements supporting charges criminalizing constitutionally protected conduct, and their actions caused Mr. Aristeo to be arrested, and his residence searched and property seized.

97.     The conducts of individual DEFENDANTS as described herein violate the basic rights of Mr. Aristeo to be free from pre-conviction malicious prosecution, unreasonable search and seizure, false imprisonment, and restrictions on his speech, and their conduct violated clearly established law; no reasonable person would believe that these actions were lawful. As a direct proximate result, Mr. Aristeo would not have endured the wrongful institution of the legal process and the detention and loss of property that resulted therefrom.

### ELEVENTH CLAIM FOR RELIEF
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

98.     The allegations of paragraphs 1 through 97 are realleged and incorporated by reference as if fully set forth herein.

99.     The actions of individual DEFENDANTS as described herein violate the basic rights of Mr. Aristeo to be free from the intentional infliction of emotional distress.

### TWELFTH CLAIM FOR RELIEF

17

## INTERFERENCE WITH CIVIL RIGHTS AND INDIVIDUAL LIBERTY

100.    The allegations of paragraphs 1 through 99 are realleged and incorporated by reference as if fully set forth herein.

101.    The actions of DEFENDANTS as described herein violate the basic rights of Mr. Aristeo to be free from those who conspire to interfere with, or those who neglect to prevent the interference to civil rights and individual liberty as provided by 42 U.S. Code § 1985 and 1986. The DEFENDANTS had a civil duty to make statements of fact to law-enforcement when interviewed, not embellished statements that would deliberately incriminate an innocent person.

### THIRTEENTH CLAIM FOR RELIEF
### VIOLATION OF THE RIGHT TO SPEAK FREELY AND SELF-EXPRESSION

102.    The allegations of paragraphs 1 through 101 are realleged and incorporated by reference as if fully set forth herein.

103.    The actions of individual DEFENDANTS as described herein violate the basic rights of Mr. Aristeo to express himself publicly as guaranteed by the First Amendment of the United States Constitution, and to speak, write, and publish freely as guaranteed by Article I, Section 6 of the New Jersey State Constitution.

### FOURTEENTH CLAIM FOR RELIEF
### VIOLATION OF THE FOURTH AMENDMENT RIGHT TO PRIVACY

104.    The allegations of paragraphs 1 through 103 are realleged and incorporated by reference as if fully set forth herein.

105.    The actions of individual DEFENDANTS described herein violate the basic rights of Mr. Aristeo to be free from unreasonable search, seizure, and the invasion of privacy guaranteed by the Fourth Amendment of the United States Constitution, and by Article I, Section 7 of the New Jersey Constitution.

## FIFTEENTH CLAIM FOR RELIEF
## CONSPRIACY TO VIOLATE CIVIL RIGHTS AND INDIVIDUAL LIBERTY

106.    The allegations of paragraphs 1 through 105 are realleged and incorporated by reference as if fully set forth herein.

107.    The actions of individual DEFENDANTS described herein constitute a conspiracy that caused the violation of Mr. Aristeo's basic rights to property, freedom of expression, freedom of association, and freedom from unreasonable search and seizure, as guaranteed by the First, Fourth, and Fourteenth Amendments of the United States Constitution.

## VII. PRAYER FOR RELIEF

WHEREFORE, Mr. Aristeo respectfully requests the following relief:

A. Issue a declaratory judgment that: (1) individual DEFENDANTS conspired to violate and violated Federal Regulations, United States and/or New Jersey State Constitution(s); (2) all "civil no-contact agreements" between Defendant Raines and Mr. Aristeo are void *ab initio*; and (3) Defendant Raines interfered with government assisted programs.

B. Award double damages to him, and against Defendant Raines and Webmarcom LLC and/or John/Jane Doe 1-10, jointly and severely, in an amount to be ascertained at trial, for violations to the Copyright Act;

C. Award compensatory damages to him, and against individual DEFENDANTS, jointly and severely, in an amount to be ascertained at trial;

D. Award punitive damages to him, and against all individual Defendants, jointly and severely, in an amount to be ascertained at trial;

E. Issue statutory fines against individual Defendants, jointly and severely, in an amount to be ascertained at trial for their conspiracy to violate and the violations to Federal and

State regulations as named herein; and the laws and regulations protecting the rights and personal liberties of Mr. Aristeo.

F. Award pre-judgment and post-judgment interest and recovery of his costs, as well as reasonable attorneys' fees pursuant to 42 U.S.C. § 1988, N.J.S.A. 10:6-2, and other applicable laws;

G. Issue a Final Restraining Order against individual DEFENDANTS to prevent any further harassment of Mr. Aristeo;

H. Issue an injunction mandating the indefinite Temporary Restraining Order against Mr. Aristeo be void *ab initio*, and dismissed; and

I. Such other and further relief as this Court may deem just and proper.

## NOTICE OF PER DIEM TIME-UNIT CLOSING ARGUMENT

PLEASE TAKE NOTICE that Plaintiff(s) will use per diem argument during closing argument at Trial and suggest to Jury that unliquidated damages be calculated on a time-unit basis without reference to a specific sum.  Proper explanatory instructions to jury shall be requested.

## DEMAND FOR DISCOVERY

Plaintiff hereby demands that answering defendant respond to the Notice of Deposition, Request for Production of Documents and Interrogatories that follow.

Respectfully submitted,

**BRUCE ARISTEO**
Plaintiff, *pro se*

DATE: December 8, 2014

20

# EXHIBIT   A



**web MarCom.Net**
Internet Strategies

856.504.6066 [Office]
856.504.6067   [Fax]
856.217.8341 [mobile]
jody@webmarcom.net [Email]
www.WebMarCom.net [Web]
PO Box 891 ~ Voorhees, NJ 08043

**Agreement    for Production of Web Site**

**Client Name:** Summit Professional Associates, LLC
**Contact Name:** Scott Soslow
**Phone:** (856) 216-1128
**Email:** scott.soslow@gmail.com
**Address:**
**Web Site:** New Site

### DESCRIPTION OF PROJECT AND PROCESS

1. **WebMarCom LLC,** referred to here as "Design Firm", will plan, design, and code a web site for the individual or corporation named above, referred to in this document as "Client", to the specifications in the attached SITE SPECIFICATION.

2. The estimate included here covers only that which is described in the SITE SPECIFICATION. Additional work will result in additional charges. Additional work is defined as the addition of pages, graphics, or other significant features, any graphic, page design, or actual page requiring more than two rounds of revisions, revisions to text content provided ready for publication, changes to elements which have been finalized, or significant changes in plan, scope, or direction of project. In this case, Client will be provided with a written CHANGE ORDER including an estimate for the additional work.

3. The process for the creation of visuals, such as graphics and page designs, consists of Design Firm providing drafts and asking for feedback from Client; the feedback is then used to produce another draft. This estimate assumes that 2 rounds of this process for each design element will suffice.

4. Text content will be provided by Scott Soslow as final drafts ready for publication and in digital form (ie. MSWord or Open Office)*. Graphic content will be provided by Client in an orderly manner and clearly labeled as to desired use on site, these images must be in the highest possible resolution and size for optimal quality and resizing. *Content to be edited to improve optimization in search engines. Also, if needed,  graphic images or stock photos to be purchased on behalf of client at cost. Any additional manipulation of art, photos or graphics to be invoiced hourly at rate of $100/hour for graphic design or code.

5. To maintain our portfolio credentials, and the integrity of any applicable copyrights, Design Firm shall be entitled to place an unobtrusive credit with a hypertext link ("Web Site Design by...") in the footer on each page of the web site. Design Firm is also entitled to reproduce samples of Client's web site in our portfolio and in any marketing materials.

6. Design Firm may use qualified subcontractors under our supervision for any or all work on this project.

### ESTIMATE AND PAYMENT ARRANGEMENTS

7. Design Firm estimates that the cost for producing the site described in the attached SITE SPECIFICATION will be $1,200.

8. Payment shall be made as follows:

   A deposit of 40% of estimated total is due upon signing of this Agreement, before work begins;

   A second payment of 20% of the estimated total (adjusted for changes in estimate if necessary) is due when page templates (without added content) are complete and approved. Upon receipt of payment it is acknowledged that page templates are satisfactory to Client and any changes to overall design or layout after receipt of payment will incur additional charges;

A final 40% payment (adjusted again for changes in estimate if necessary) is due upon completion of site as specified, before site is published on the Internet. Upon receipt of payment it is acknowledged that entire site is satisfactory to Client and this agreement has been fulfilled in its entirety. Any additional changes will require a new agreement or addendum to this agreement as an estimate.

9. In the event of the cancellation of this agreement, or any delay of more than 90 days, we will invoice you for the greater of either: (1) all work completed up to the date of notification, based upon the percentage of the project finished, including expenses; or (2) 20% of the agreed-upon estimate plus expenses, and this contract shall be considered fulfilled by Design Firm. All incomplete work will remain the property of Design Firm. All payments already made will first be applied to these charges.

### OTHER LEGAL AGREEMENTS

10. Design Firm will maintain the confidentiality of Client's source materials, technical and marketing plans and all other sensitive information.

11. Design Firm and Client agree that any dispute arising out of this Agreement shall first be resolved by mediation, if possible.  This contract was entered into in Camden County, New Jersey, and any necessary arbitration or litigation will take place in this county.

12. Upon full payment of all invoices due, copyright to page designs produced by Design Firm for Client shall belong to Client. Secondary materials created by Design Firm during production, including drafts, plans, graphic source files, and templates, remain the sole property of Design Firm unless other arrangements are made.

13. Client is solely responsible for the editorial content of the material included on its website. Accordingly, Client agrees that it will defend and indemnify (hold harmless) Design Firm from any suit, demand, or claim resulting from the editorial content of the website.

14. Client represents to Design Firm and unconditionally guarantees that any elements of text, graphics, photos, designs, trademarks, or other artwork furnished to Design Firm for inclusion in Client's web site are owned by Client, or that Client has permission from the rightful owner to use each of these elements, and will hold harmless, protect and defend Design Firm and its subcontractors from any claim or suit arising from the use of such elements furnished by the Client.

15. Design Firm will set up web hosting for Client with a professional hosting company known to be reliable. However, Design Firm makes no guarantees as to minimum "uptime", nor shall Design Firm be held responsible for any direct, indirect, special or consequential damages resulting from possible lapses in hosting services. Such possible damages include any lost profits or business interruption or loss of digital data. It is the Client's responsibility to purchase hosting and domain registration.

16. Design Firm will not be liable to Client or to any third party for any damages arising from the use of web site.

17. If any provision of this agreement shall be unlawful, void, or for any reason unenforceable, then that provision shall be deemed severable from this agreement and shall not affect the validity and enforceability of any remaining provisions.

18. To be valid, this Agreement must be signed within 30 days of December 5, 2014, and be accompanied by a deposit of the amount specified above. All payments must be made by check or money order.

19. To be valid, this Agreement must have an attached SITE SPECIFICATION document, initialed and dated by Design Firm and Client.

20. This Agreement may have attachments consisting of one or more initialed and dated CHANGE ORDERS and *The Print & New Media Design Trade Customs*, whose terms shall become part of this contract.

*Our signatures below indicate our agreement with the terms of this contract.*

_____     _____

WebMarCom                                                    Date

---
Scott Soslow                          Date

Scott Soslow                          Date

## Site Specification

The following describes the planned web site for the purposes of the estimate included in the attached contract. Specifications in subsequent CHANGE ORDERS shall supersede these.

### 1. Total Number Of Pages:
A) 8

### 2. Total Number Of Graphic Images:
A) To be supplied by Scott Soslow. Additional images or stock photography or art to be invoiced at cost. Graphic design or manipulation beyond initial design phase to be invoiced at $100/hour.

### 3. List Of Planned Pages:
A) HOME - General description of the company and services, including keywords and geo-target
B) ABOUT US - Experience and qualifications, memberships (Chamber, etc), affiliations
C) SERVICES - Page of general information
   a) SERVICES 1 - First page of services
   b) SERVICES 2 - Second page of services
   c) SERVICES 3 - Third page of services
D) CONTACT US - Form, Google Map if required, phone
E) BLOG - Articles, Lists, Ongoing content

F) Possible Inclusions
   a) APPLICATION FORM
   b) CONTACT FORM
   c) EMAIL SIGN-UP

### 4. Details On Text Content To Be Included
A) Suggest Sign Up for newsletter on every page
B) Suggest contact us form on every page
C) Call to action features - creative financing ideas

### 5. Details On Graphic Elements To Be Included
A) Logo (supplied or simple logo created)
B) Header graphic (with up to 2 versions - original and 1 revision)

### 6. Site Structure/Navigation
A) Top Navigation with drop downs

### 7. Design/Layout/Color Concepts
A) Colors to be determined
B) Clean, uncluttered appearance
C) Wordpress - easy content management

### 8. Interactive Forms
A) Sign Up For Newsletter
B) Contact us
C) Call To Action (creative financing ideas)
D) Connect to Facebook (Like)

### 9. Search Engine Positioning Measures
A) Evaluate content
B) Keyword research
C) Revisions to content

---
WebMarCom                          Date

## The Print & New Media Design Trade Customs

*The Print & New Media (P&NM) Design Trade Customs* were developed by the International Design by Electronics Association, the Graphic Artists Guild and the Art Directors' Club of Metro- politan Washington. They have been adopted by the graphic design industry and reflect the current laws and practices of design professionals.
     The *P&NM Design Trade Customs* are those practices which delineate the specific areas of responsibility with regard to a special trade or operation which might not be outlined in a commercial agreement. Where a commercial agreement is silent with regard to one or more practices, the P&NM Design Trade Customs areas are used to interpret the intent of the parties.
     It should be clearly understood that the *P&NM Design Trade Customs* protect both parties in a commercial agreement. It is, therefore, the responsibility and obligation of involved parties to understand their content and meaning of these customs.

**1. Estimate:** A preliminary projection of cost which is not intended to be binding. Estimates are based upon prevailing wages, the anticipated hours of work and cost of materials and supplies necessary to produce work in accordance with preliminary copy, style and specifications and are not binding upon the designer unless a firm quotation has been issued.

**2. Quotation:** A quotation is a fixed price for producing a given project. A quotation is firm unless otherwise specified. Quotations are subject to acceptance within 30 days and are based on the cost of labor and materials on the date of the quote. If changes occur in the cost of materials, labor or other costs prior to acceptance, the right is reserved to change the price quotes. Subsequent projects will be subject to price revision if required. Quotations do not include alterations or applicable sales tax unless otherwise specified.

**3. Alterations:** Alteration charges are incurred by a client when a change is made to: approved layout, approved manuscript, mechanicals or disk produced correctly or any new work not within the original specifications.

**4. Overtime:** Overtime is work performed by the designer in excess of the work schedule of the project. Overtime may be charged at the designers prevailing rates for this service.

**5. Copyright/Ownership:** Creative work such as sketches, illustrations, layouts, designs, icons, logos, etc. produced on paper, computer disks or any other medium, are protected under the 1976 copyright act. Until the designer transfers ownership rights, creative work remains the property of the designer.
     There can be no use of the designer's work except upon compensation to be determined by the designer. Purchase orders issued after the completion of creative work, claiming the clients ownership of creative work, are not valid unless agreed upon by both parties.

**6. Experimental Work:** Experimental or preliminary work performed at the client's request will be charged at current rates and may not be used by the client until the designer has been reimbursed in full for the work performed. All experimental work performed by a designer without authorization of the client is not billable.

**7. Condition of Copy:** If original copy, disk or manuscript, furnished by the client to the designer differs from that which has been originally described and consequently quoted, the original quotation shall be amended or a new quotation will be issued.

**8. Production Schedules:** Production schedules will be established and adhered to by client and designer, provided that neither shall incur any liability or penalty for delays due to state of war, riot, civil disorder, fire, labor trouble, strikes, accidents, energy failure, equipment breakdown, delays of suppliers or carriers, action of government or civil authority and acts of God or other causes beyond the control of client or designer. Where production schedules are not adhered to by the client, final delivery date(s) will be subject to renegotiation.

**9. Client's Property:** The designer will maintain fire, extended coverage, vandalism, malicious mischief and sprinkler leakage insurance covering all property belonging to the client while such property is in designer's possession. The designer's liability for such property shall not exceed the amount recoverable from such insurance.
     Client's property of extraordinary value shall be specially protected, only if the client identifies the property as requiring extraordinary coverage.
     The matter of first reproduction rights with subsequent reproduction rights is subject to additional compensation.

**10. Outright Purchase vs. Reproduction Rights:** These terms should be established at the time of purchase. Outright purchase gives the buyer physical possession of the artwork, disk, or negatives, while reproduction rights and related copyright interests require the return of the original to the artist. Outright purchase does not give to the buyer commercial or private reproduction rights or any other copyright interests unless so stipulated in the purchase agreement. should be clearly understood at the time of purchase.

**11. Re-use and Extended Use of Artwork, Disk or Negatives:** Artwork disk or negatives purchased for a specific use cannot be re-used or adapted for other purposes than originally planned without additional compensation to the artist. If this possibility exists at the time of purchase, it should be so stated and the price adjusted accordingly. If re-use or adaptation occurs after purchase, the buyer should negotiate reasonable additional compensation with the artist.
     Whenever adaptation requires the services of an artist, and the creator has performed to the buyer's satisfaction, the artist should be given the opportunity to revise his own work.

**12. Mark-ups:** Any out-of-agency services or goods such as typography, printing, photography, etc., or materials used specifically for the completion of a given project will be billed to the client with an appropriate mark-up. This mark-up is a handling fee only and unless otherwise agreed, does not include any professional or management fees.

**13. Speculation:** Graphic designs should not be asked for on speculation by a client. Design contests, except for educational or philanthropic purposes, are also considered speculation and not a trade custom.

**14. Terms:** By assigning an order either verbally or in writing or by purchase order, the client agrees to the designer's terms of payment and late charges on unpaid balances prescribed to by the designer. Payment shall be whatever was set forth in quotation or invoice unless otherwise provided in writing. Disputes over invoices must be made by the client in writing within a period of fifteen (15) days after the client's receipt of the invoice in question. Failure to make such claim within the stated period shall constitute acceptance and an admission that the client agrees with the invoice submitted. If only a portion of the invoice is in dispute, it is the client's responsibility to pay the portion not in dispute within the terms of the invoice.

**15. Liability:** A designer is only liable for the correction of errors made during the design and mechanical processes. The ultimate proofing prior to printing is always the client's responsibility unless the designer accepts this responsibility in written agreement. In any instance, the designer cannot be liable for more than the design and mechanical costs of a job in dispute.

**16. Indemnification:** The client shall indemnify and hold harmless the designer from any and all losses, costs, expenses, and damages (including court costs and reasonable attorney fees) on account of any and all manner of claims, demands, actions, and proceedings that may be instituted against the designer on grounds alleging that the said designer unknowingly violated any copyrights or any proprietary right of any person.
     Any materials such as photographs, photostats, transparencies, drawings, paintings, maps, diagrams, etc. furnished by the client to the designer should be free and clear of any copyright or trademark infringements. The designer is indemnified against any liability pursuant to the client's failure to obtain correct usage rights and said materials.
     Any false statements knowingly or unknowingly given to the designer, by the client, to be used as factual information to promote a product or service shall remain the client's sole responsibility for substantiation. The designer is indemnified from any liability due to the client's negligence.

**17. Print Management/ Press Inspections:** If a designer performs a press inspection for a client, the client's responsibility for proofing remains in effect. If the client has signed a printer's blueline, the designer is not responsible for any errors reflected in the approved bluelineor final proof. If the designer approves color on a press proof or any other color proof, the designer is only responsible for approving color acceptable by industry standards. The printer is responsible for ensuring that the subsequent press run matches the color within acceptable standards of the proof approved by the designer.

**18. New Media:** If a designer reviews a Website for a client, the client's responsibility for proofing remains in effect. If the client has approved a site's content, the designer is not responsible for any errors reflected on the approved site. The client's Webmaster is responsible for ensuring that the colors and images remain within the acceptable standards of what has been approved by the designer.

© 2000 Art Directors Club of Metropolitan Washington

5

6

# EXHIBIT   B

# Re: PPT Design

| | |
|---|---|
| **From:** | Jody Raines <jody@webmarcom.net> |
| **To:** | Tony Paske <tony.paske@gmail.com> |
| **Subject:** | Re: PPT Design |
| **Sent:** | Thu, 27 Jan 2011 14:19:49 -0500 |

Hi Tony,

Bruce works for me, so I have flexibility.  Because of our relationship, I'm discounting his rate, which usually is at $125 to $100/hour.  Let's see how the project pans out.  I want to get you something you are happy with.  While I like the idea of the iconic skyline, for example, it's something he has to create by hand.  So he has to distill the icons and create silhouettes, then link them together.  My guess is that it's not an hour or two effort, and may wind up being something that isn't critical, but a 'nice to have'.

That's why I want to have an idea of time before he just creates the images.  I don't want to come back to you with an invoice that's unanticipated - that's why I want to keep you in the loop on the time so far and then you can make informed decisions to guide us to stay within your budget.

I'm brainstorming to figure out the least time consuming way to have him revise the city names as well.  He manipulated all of the names independently then put them together in the background, which was time consuming. I would like to figure a way he can do this more easily or faster.  The software is an image editing software, not a word processing software, so it doesn't treat the words as words but as pictures.


Jody Raines
Jody@WebMarCom.net
856.217.8341 (mobile)
856.504.6066 (office)
856.504.6067 (fax)
**www.WebMarCom.net**
Internet Strategies ~ Web Marketing ~ Social Media ~ Web Design

Follow me:
www.Twitter.com/SunSwept
www.Facebook.com/JodyRaines
www.Facebook.com/WebMarCom
www.LinkedIn.com/in/JodyRaines
www.WebMarCom.net/blog

On Jan 27, 2011, at 2:06 PM, Tony Paske wrote:

> Thanks for the update, Jody. What was the rate we landed on? Or is that something I will need to discuss with him?
>
> Tony Paske
> c 317.225.1900
> promotion1.com
>
> On Jan 27, 2011, at 11:01 AM, Jody Raines <jody@webmarcom.net> wrote:
>
>> Hi Tony,
>>
>> I asked Bruce to give me an estimate of how much time it will take to create the iconic skyline and

also to create the background.  Those are the two time consuming items, other than the logo.

Bruce and I have some ideas for your logo.  We can discuss these on Friday.

So far, we had 2 phone meetings, and Bruce did some work behind the scenes.  I don't want to run up the expense without keeping you appraised.

Meeting 1/21 was 3 hours
Meeting 1/26 was 2 hours

Bruce worked independently on refining the ideas and testing within a Hubspot portal to be sure that these ideas would work.  I'll check to see how much time he spent on that.

I'll shoot you a note as soon as I have a handle on where we are so far as well as what the other items will be in terms of time so we stay on track with regard to your budget.

Jody


Jody Raines
Jody@WebMarCom.net
856.217.8341 (mobile)
856.504.6066 (office)
856.504.6067 (fax)
**www.WebMarCom.net**
Internet Strategies ~ Web Marketing ~ Social Media ~ Web Design

Follow me:
www.Twitter.com/SunSwept
www.Facebook.com/JodyRaines
www.Facebook.com/WebMarCom
www.LinkedIn.com/in/JodyRaines
www.WebMarCom.net/blog

On Jan 27, 2011, at 1:24 PM, Tony Paske wrote:

> Hi, Bruce. I had a chance to show Steve (and others on the team) the fruits of your labor since last Friday, and he was very pleased with what we have. We do have some modifications to propose, and here they are:
>
> - include the iconic silhouettes at the bottom (Statue of Liberty, Golden Gate Bridge, St Louis Arch, Seattle Space Needle, Sears Tower, Washington Monument, Empire State Building, Hollywood Sign)
> - vary the font sizes so that the more "important" cities (based on the list I sent) are larger (this will do away with the depth effect, but we'd like to see it)
> - start all of the fonts smaller so that we can see more each city name
> - social media only at the top (in color)
> - phone number on top: remove the "1"
> - include text in header (but faded and behind header content)
> - adjust text so that it doesn't *need* to go into footer (since we aren't able to put it in the footer, let's adjust so that it doesn't look like the text is cut off; let me know if that request doesn't make sense)
> - any ideas on stacking the PPT logo?
>
> That's the list. Please let me know how this works into your schedule and when it is realistic to see these modifications. Ideally we'd be able to see something on our call tomorrow, but I realize this is a tight turn-around. I just need to share with Steve what is realistic.

Thanks!
Tony

| | |
|---|---|
| **Received:** | (qmail 2074 invoked from network); 27 Jan 2011 19:20:04 -0000 |
| **Received:** | from unknown (HELO m1pismtp01-006.prod.mesa1.secureserver.net) ([10.8.12.6]) (envelope-sender <jody@webmarcom.net>) by p3plsmtp05-06.prod.phx3.secureserver.net (qmail-1.03) with SMTP for <bruce@webmarcom.net>; 27 Jan 2011 19:20:04 -0000 |
| **X-IronPort-Anti-Spam-Result:** | AsQBAC9UQU1MYD4YkWdsb2JhbACWYoYEAYgWFQEBAQEJCwoHEQMhvEMCgw+CPgSFF4pU |
| **Received:** | from qmta02.westchester.pa.mail.comcast.net ([76.96.62.24]) by m1pismtp01-006.prod.mesa1.secureserver.net with ESMTP; 27 Jan 2011 12:20:03 -0700 |
| **Received:** | from omta12.westchester.pa.mail.comcast.net ([76.96.62.44]) by qmta02.westchester.pa.mail.comcast.net with comcast id 0j1g1g0090xGWP852jL3LJ; Thu, 27 Jan 2011 19:20:03 +0000 |
| **Received:** | from [192.168.2.2] ([68.36.32.108]) by omta12.westchester.pa.mail.comcast.net with comcast id 0jKp1g00e2KyMc43YjL3TE; Thu, 27 Jan 2011 19:20:03 +0000 |
| **Mime-Version:** | 1.0 (Apple Message framework v1082) |
| **Content-Type:** | multipart/alternative; boundary=Apple-Mail-72-21210195 |
| **In-Reply-To:** | <80A0FB63-15E2-446E-9BF4-1AEF21672AB9@gmail.com> |
| **Message-Id:** | <607421BE-E46B-40A5-8179-F370D8E34377@webmarcom.net> |
| **References:** | <AANLkTikhwH8kdpgie8dbst2s8UYUDbbERePkx4T_hyQO@mail.gmail.com> <850EC9CE-CE27-4C8E-8DFA-B64841B37C63@webmarcom.net> <80A0FB63-15E2-446E-9BF4-1AEF21672AB9@gmail.com> |
| **X-Mailer:** | Apple Mail (2.1082) |
| **X-Nonspam:** | Statistical 50% |

| Key | Value Type | Value |
|---|---|---|
| *Property list* | *Dictionary* | *(8 values)* |
| color | *String* | 000000 |
| date-sent | *Number* | 1296155989 |
| flags | *Number* | 261269 |
| original-mailbox | *String* | pop://bruce%40webmarcom.net@pop.secureserver.net/ |
| remote-id | *String* | 1296156004.245708.p3plgemini05-06.prod.phx.1108392256 |
| sender | *String* | Jody Raines <jody@webmarcom.net> |
| subject | *String* | Re: PPT Design |
| to | *String* | Tony Paske <tony.paske@gmail.com> |

# EXHIBIT   C

# Terms of Service

Community Guidelines

## 1. Your Acceptance

1. By using or visiting the YouTube website or any YouTube products, software, data feeds, and services provided to you on, from, or through the YouTube website (collectively the "Service") you signify your agreement to (1) these terms and conditions (the "Terms of Service"), (2) Google's Privacy Policy, found at http://www.youtube.com/t/privacy and incorporated herein by reference, and (3) YouTube's Community Guidelines, found at http://www.youtube.com/t/community_guidelines and also incorporated herein by reference. If you do not agree to any of these terms, the Google Privacy Policy, or the Community Guidelines, please do not use the Service.

2. Although we may attempt to notify you when major changes are made to these Terms of Service, you should periodically review the most up-to-date version http://www.youtube.com/t/terms). YouTube may, in its sole discretion, modify or revise these Terms of Service and policies at any time, and you agree to be bound by such modifications or revisions. Nothing in these Terms of Service shall be deemed to confer any third-party rights or benefits.

## 2. Service

1. These Terms of Service apply to all users of the Service, including users who are also contributors of Content on the Service. "Content" includes the text, software, scripts, graphics, photos, sounds, music, videos, audiovisual combinations, interactive features and other materials you may view on, access through, or contribute to the Service. The Service includes all aspects of YouTube, including but not limited to all products, software and services offered via the YouTube website, such as the YouTube channels, the YouTube "Embeddable Player," the YouTube "Uploader" and other applications.

2. The Service may contain links to third party websites that are not owned or controlled by YouTube. YouTube has no control over, and assumes no responsibility for, the content, privacy policies, or practices of any third party websites. In addition, YouTube will not and cannot censor or edit the content of any third-party site. By using the Service, you expressly relieve YouTube from any and all liability arising from your use of any third-party website.

3. Accordingly, we encourage you to be aware when you leave the Service and to read the terms and conditions and privacy policy of each other website that you visit.

## 3. YouTube Accounts

1. In order to access some features of the Service, you will have to create a YouTube or Google Account. You may never use another's account without permission. When creating your account, you must provide accurate and complete information. You are solely responsible for the activity that occurs on your account, and you must keep your account password secure. You must notify YouTube immediately of any breach of security or unauthorized use of your account.

2. Although YouTube will not be liable for your losses caused by any unauthorized use of your account, you may be liable for the losses of YouTube or others due to such unauthorized use.

## 4. General Use of the Service—

## Permissions and Restrictions

YouTube hereby grants you permission to access and use the Service as set forth in these Terms of Service, provided that:

1. You agree not to distribute in any medium any part of the Service or the

Content without YouTube's prior written authorization, unless YouTube makes available the means for such distribution through functionality offered by the Service (such as the Embeddable Player).

2. You agree not to alter or modify any part of the Service.

3. You agree not to access Content through any technology or means other than the video playback pages of the Service itself, the Embeddable Player, or other explicitly authorized means YouTube may designate.

4. You agree not to use the Service for any of the following commercial uses unless you obtain YouTube's prior written approval:

- the sale of access to the Service;
- the sale of advertising, sponsorships, or promotions placed on or within the Service or Content; or
- the sale of advertising, sponsorships, or promotions on any page of an ad-enabled blog or website containing Content delivered via the Service, unless other material not obtained from YouTube appears on the same page and is of sufficient value to be the basis for such sales.

5. Prohibited commercial uses do not include:

- uploading an original video to YouTube, or maintaining an original channel on YouTube, to promote your business or artistic enterprise;
- showing YouTube videos through the Embeddable Player on an ad-enabled blog or website, subject to the advertising restrictions set forth above in Section 4.D; or
- any use that YouTube expressly authorizes in writing.

(For more information about what constitutes a prohibited commercial use, see our FAQ.)

6. If you use the Embeddable Player on your website, you may not modify, build upon, or block any portion or functionality of the Embeddable Player, including but not limited to links back to the YouTube website.

7. If you use the YouTube Uploader, you agree that it may automatically download and install updates from time to time from YouTube. These updates are designed to improve, enhance and further develop the Uploader and may take the form of bug fixes, enhanced functions, new software modules and completely new versions. You agree to receive such updates (and permit YouTube to deliver these to you) as part of your use of the Uploader.

8. You agree not to use or launch any automated system, including without limitation, "robots," "spiders," or "offline readers," that accesses the Service in a manner that sends more request messages to the YouTube servers in a given period of time than a human can reasonably produce in the same period by using a conventional on-line web browser. Notwithstanding the foregoing, YouTube grants the operators of public search engines permission to use spiders to copy materials from the site for the sole purpose of and solely to the extent necessary for creating publicly available searchable indices of the materials, but not caches or archives of such materials. YouTube reserves the right to revoke these exceptions either generally or in specific cases. You agree not to collect or harvest any personally identifiable information, including account names, from the Service, nor to use the communication systems provided by the Service (e.g., comments, email) for any commercial solicitation purposes. You agree not to solicit, for commercial purposes, any users of the Service with respect to their Content.

9. In your use of the Service, you will comply with all applicable laws.

10. YouTube reserves the right to discontinue any aspect of the Service at any time.

## 5. Your Use of Content

In addition to the general restrictions above, the following restrictions and conditions apply specifically to your use of Content.

1. The Content on the Service, and the trademarks, service marks and logos ("Marks") on the Service, are owned by or licensed to YouTube, subject to copyright and other intellectual property rights under the law.

2. Content is provided to you AS IS. You may access Content for your information and personal use solely as intended through the provided functionality of the Service and as permitted under these Terms of Service. You shall not download any Content unless you see a "download" or similar link displayed by YouTube on the Service for that Content. You shall not copy, reproduce, distribute, transmit, broadcast, display, sell, license, or otherwise exploit any Content for any other purposes without the prior written consent of YouTube or the respective licensors of the Content. YouTube and its licensors reserve all rights not expressly granted in and to

the Service and the Content.

3. You agree not to circumvent, disable or otherwise interfere with security-related features of the Service or features that prevent or restrict use or copying of any Content or enforce limitations on use of the Service or the Content therein.

4. You understand that when using the Service, you will be exposed to Content from a variety of sources, and that YouTube is not responsible for the accuracy, usefulness, safety, or intellectual property rights of or relating to such Content. You further understand and acknowledge that you may be exposed to Content that is inaccurate, offensive, indecent, or objectionable, and you agree to waive, and hereby do waive, any legal or equitable rights or remedies you have or may have against YouTube with respect thereto, and, to the extent permitted by applicable law, agree to indemnify and hold harmless YouTube, its owners, operators, affiliates, licensors, and licensees to the fullest extent allowed by law regarding all matters related to your use of the Service.

# 6. Your Content and Conduct

1. As a YouTube account holder you may submit Content to the Service, including videos and user comments. You understand that YouTube does not guarantee any confidentiality with respect to any Content you submit.

2. You shall be solely responsible for your own Content and the consequences of submitting and publishing your Content on the Service. You affirm, represent, and warrant that you own or have the necessary licenses, rights, consents, and permissions to publish Content you submit; and you license to YouTube all patent, trademark, trade secret, copyright or other proprietary rights in and to such Content for publication on the Service pursuant to these Terms of Service.

3. For clarity, you retain all of your ownership rights in your Content. However, by submitting Content to YouTube, you hereby grant YouTube a worldwide, non-exclusive, royalty-free, sublicenseable and transferable license to use, reproduce, distribute, prepare derivative works of, display, and perform the Content in connection with the Service and YouTube's (and its successors' and affiliates') business, including without limitation for promoting and redistributing part or all of the Service (and derivative works

thereof) in any media formats and through any media channels. You also hereby grant each user of the Service a non-exclusive license to access your Content through the Service, and to use, reproduce, distribute, display and perform such Content as permitted through the functionality of the Service and under these Terms of Service. The above licenses granted by you in video Content you submit to the Service terminate within a commercially reasonable time after you remove or delete your videos from the Service. You understand and agree, however, that YouTube may retain, but not display, distribute, or perform, server copies of your videos that have been removed or deleted. The above licenses granted by you in user comments you submit are perpetual and irrevocable.

4. You further agree that Content you submit to the Service will not contain third party copyrighted material, or material that is subject to other third party proprietary rights, unless you have permission from the rightful owner of the material or you are otherwise legally entitled to post the material and to grant YouTube all of the license rights granted herein.

5. You further agree that you will not submit to the Service any Content or other material that is contrary to the YouTube Community Guidelines, currently found at http://www.youtube.com/t/community_guidelines, which may be updated from time to time, or contrary to applicable local, national, and international laws and regulations.

6. YouTube does not endorse any Content submitted to the Service by any user or other licensor, or any opinion, recommendation, or advice expressed therein, and YouTube expressly disclaims any and all liability in connection with Content. YouTube does not permit copyright infringing activities and infringement of intellectual property rights on the Service, and YouTube will remove all Content if properly notified that such Content infringes on another's intellectual property rights. YouTube reserves the right to remove Content without prior notice.

# 7. Account Termination Policy

1. YouTube will terminate a user's access to the Service if, under appropriate circumstances, the user is determined to be a repeat infringer.

2. YouTube reserves the right to decide whether Content violates these Terms of Service for reasons other than copyright infringement, such as,

but not limited to, pornography, obscenity, or excessive length. YouTube may at any time, without prior notice and in its sole discretion, remove such Content and/or terminate a user's account for submitting such material in violation of these Terms of Service.

## 8. Digital Millennium Copyright Act

1. If you are a copyright owner or an agent thereof and believe that any Content infringes upon your copyrights, you may submit a notification pursuant to the Digital Millennium Copyright Act ("DMCA") by providing our Copyright Agent with the following information in writing (see 17 U.S.C 512(c)(3) for further detail):

• A physical or electronic signature of a person authorized to act on behalf of the owner of an exclusive right that is allegedly infringed;

• Identification of the copyrighted work claimed to have been infringed, or, if multiple copyrighted works at a single online site are covered by a single notification, a representative list of such works at that site;

• Identification of the material that is claimed to be infringing or to be the subject of infringing activity and that is to be removed or access to which is to be disabled and information reasonably sufficient to permit the service provider to locate the material;

• Information reasonably sufficient to permit the service provider to contact you, such as an address, telephone number, and, if available, an electronic mail;

• A statement that you have a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law; and

• A statement that the information in the notification is accurate, and under penalty of perjury, that you are authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.

YouTube's designated Copyright Agent to receive notifications of claimed infringement is Shadie Farazian, 901 Cherry Ave., San Bruno, CA 94066, email: copyright@youtube.com, fax: 650-872-8513. For clarity, only DMCA notices should go to the Copyright Agent; any other feedback, comments, requests for technical support, and other communications should be

directed to YouTube customer service through http://www.google.com/support/youtube. You acknowledge that if you fail to comply with all of the requirements of this Section 5(D), your DMCA notice may not be valid.

2. Counter-Notice. If you believe that your Content that was removed (or to which access was disabled) is not infringing, or that you have the authorization from the copyright owner, the copyright owner's agent, or pursuant to the law, to post and use the material in your Content, you may send a counter-notice containing the following information to the Copyright Agent:

• Your physical or electronic signature;

• Identification of the Content that has been removed or to which access has been disabled and the location at which the Content appeared before it was removed or disabled;

• A statement that you have a good faith belief that the Content was removed or disabled as a result of mistake or a misidentification of the Content; and

• Your name, address, telephone number, and e-mail address, a statement that you consent to the jurisdiction of the federal court in San Francisco, California, and a statement that you will accept service of process from the person who provided notification of the alleged infringement.

If a counter-notice is received by the Copyright Agent, YouTube may send a copy of the counter-notice to the original complaining party informing that person that it may replace the removed Content or cease disabling it in 10 business days. Unless the copyright owner files an action seeking a court order against the Content provider, member or user, the removed Content may be replaced, or access to it restored, in 10 to 14 business days or more after receipt of the counter-notice, at YouTube's sole discretion.

## 9. Warranty Disclaimer

YOU AGREE THAT YOUR USE OF THE SERVICES SHALL BE AT YOUR SOLE RISK. TO THE FULLEST EXTENT PERMITTED BY LAW, YOUTUBE, ITS OFFICERS, DIRECTORS, EMPLOYEES, AND AGENTS DISCLAIM ALL

WARRANTIES, EXPRESS OR IMPLIED, IN CONNECTION WITH THE SERVICES AND YOUR USE THEREOF. YOUTUBE MAKES NO WARRANTIES OR REPRESENTATIONS ABOUT THE ACCURACY OR COMPLETENESS OF THIS SITE'S CONTENT OR THE CONTENT OF ANY SITES LINKED TO THIS SITE AND ASSUMES NO LIABILITY OR RESPONSIBILITY FOR ANY (I) ERRORS, MISTAKES, OR INACCURACIES OF CONTENT, (II) PERSONAL INJURY OR PROPERTY DAMAGE, OF ANY NATURE WHATSOEVER, RESULTING FROM YOUR ACCESS TO AND USE OF OUR SERVICES, (III) ANY UNAUTHORIZED ACCESS TO OR USE OF OUR SECURE SERVERS AND/OR ANY AND ALL PERSONAL INFORMATION AND/OR FINANCIAL INFORMATION STORED THEREIN, (IV) ANY INTERRUPTION OR CESSATION OF TRANSMISSION TO OR FROM OUR SERVICES, (IV) ANY BUGS, VIRUSES, TROJAN HORSES, OR THE LIKE WHICH MAY BE TRANSMITTED TO OR THROUGH OUR SERVICES BY ANY THIRD PARTY, AND/OR (V) ANY ERRORS OR OMISSIONS IN ANY CONTENT OR FOR ANY LOSS OR DAMAGE OF ANY KIND INCURRED AS A RESULT OF THE USE OF ANY CONTENT POSTED, EMAILED, TRANSMITTED, OR OTHERWISE MADE AVAILABLE VIA THE SERVICES. YOUTUBE DOES NOT WARRANT, ENDORSE, GUARANTEE, OR ASSUME RESPONSIBILITY FOR ANY PRODUCT OR SERVICE ADVERTISED OR OFFERED BY A THIRD PARTY THROUGH THE SERVICES OR ANY HYPERLINKED SERVICES OR FEATURED IN ANY BANNER OR OTHER ADVERTISING, AND YOUTUBE WILL NOT BE A PARTY TO OR IN ANY WAY BE RESPONSIBLE FOR MONITORING ANY TRANSACTION BETWEEN YOU AND THIRD-PARTY PROVIDERS OF PRODUCTS OR SERVICES. AS WITH THE PURCHASE OF A PRODUCT OR SERVICE THROUGH ANY MEDIUM OR IN ANY ENVIRONMENT, YOU SHOULD USE YOUR BEST JUDGMENT AND EXERCISE CAUTION WHERE APPROPRIATE.

## 10. Limitation of Liability

IN NO EVENT SHALL YOUTUBE, ITS OFFICERS, DIRECTORS, EMPLOYEES, OR AGENTS, BE LIABLE TO YOU FOR ANY DIRECT, INDIRECT, INCIDENTAL, SPECIAL, PUNITIVE, OR CONSEQUENTIAL DAMAGES WHATSOEVER RESULTING FROM ANY (I) ERRORS, MISTAKES, OR INACCURACIES OF CONTENT, (II) PERSONAL INJURY OR PROPERTY

DAMAGE, OF ANY NATURE WHATSOEVER, RESULTING FROM YOUR ACCESS TO AND USE OF OUR SERVICES, (III) ANY UNAUTHORIZED ACCESS TO OR USE OF OUR SECURE SERVERS AND/OR ANY AND ALL PERSONAL INFORMATION AND/OR FINANCIAL INFORMATION STORED THEREIN, (IV) ANY INTERRUPTION OR CESSATION OF TRANSMISSION TO OR FROM OUR SERVICES, (IV) ANY BUGS, VIRUSES, TROJAN HORSES, OR THE LIKE, WHICH MAY BE TRANSMITTED TO OR THROUGH OUR SERVICES BY ANY THIRD PARTY, AND/OR (V) ANY ERRORS OR OMISSIONS IN ANY CONTENT OR FOR ANY LOSS OR DAMAGE OF ANY KIND INCURRED AS A RESULT OF YOUR USE OF ANY CONTENT POSTED, EMAILED, TRANSMITTED, OR OTHERWISE MADE AVAILABLE VIA THE SERVICES, WHETHER BASED ON WARRANTY, CONTRACT, TORT, OR ANY OTHER LEGAL THEORY, AND WHETHER OR NOT THE COMPANY IS ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THE FOREGOING LIMITATION OF LIABILITY SHALL APPLY TO THE FULLEST EXTENT PERMITTED BY LAW IN THE APPLICABLE JURISDICTION.

YOU SPECIFICALLY ACKNOWLEDGE THAT YOUTUBE SHALL NOT BE LIABLE FOR CONTENT OR THE DEFAMATORY, OFFENSIVE, OR ILLEGAL CONDUCT OF ANY THIRD PARTY AND THAT THE RISK OF HARM OR DAMAGE FROM THE FOREGOING RESTS ENTIRELY WITH YOU.

The Service is controlled and offered by YouTube from its facilities in the United States of America. YouTube makes no representations that the Service is appropriate or available for use in other locations. Those who access or use the Service from other jurisdictions do so at their own volition and are responsible for compliance with local law.

## 11. Indemnity

To the extent permitted by applicable law, you agree to defend, indemnify and hold harmless YouTube, its parent corporation, officers, directors, employees and agents, from and against any and all claims, damages, obligations, losses, liabilities, costs or debt, and expenses (including but not limited to attorney's fees) arising from: (i) your use of and access to the Service; (ii) your violation of any term of these Terms of Service; (iii) your

violation of any third party right, including without limitation any copyright, property, or privacy right; or (iv) any claim that your Content caused damage to a third party. This defense and indemnification obligation will survive these Terms of Service and your use of the Service.

## 12. Ability to Accept Terms of Service

You affirm that you are either more than 18 years of age, or an emancipated minor, or possess legal parental or guardian consent, and are fully able and competent to enter into the terms, conditions, obligations, affirmations, representations, and warranties set forth in these Terms of Service, and to abide by and comply with these Terms of Service. In any case, you affirm that you are over the age of 13, as the Service is not intended for children under 13. If you are under 13 years of age, then please do not use the Service. There are lots of other great web sites for you. Talk to your parents about what sites are appropriate for you.

## 13. Assignment

These Terms of Service, and any rights and licenses granted hereunder, may not be transferred or assigned by you, but may be assigned by YouTube without restriction.

## 14. General

You agree that: (i) the Service shall be deemed solely based in California; and (ii) the Service shall be deemed a passive website that does not give rise to personal jurisdiction over YouTube, either specific or general, in jurisdictions other than California. These Terms of Service shall be governed by the internal substantive laws of the State of California, without respect to its conflict of laws principles. Any claim or dispute between you and YouTube

that arises in whole or in part from the Service shall be decided exclusively by a court of competent jurisdiction located in Santa Clara County, California. These Terms of Service, together with the Privacy Notice at http://www.youtube.com/t/privacy and any other legal notices published by YouTube on the Service, shall constitute the entire agreement between you and YouTube concerning the Service. If any provision of these Terms of Service is deemed invalid by a court of competent jurisdiction, the invalidity of such provision shall not affect the validity of the remaining provisions of these Terms of Service, which shall remain in full force and effect. No waiver of any term of this these Terms of Service shall be deemed a further or continuing waiver of such term or any other term, and YouTube's failure to assert any right or provision under these Terms of Service shall not constitute a waiver of such right or provision. YouTube reserves the right to amend these Terms of Service at any time and without notice, and it is your responsibility to review these Terms of Service for any changes. Your use of the Service following any amendment of these Terms of Service will signify your assent to and acceptance of its revised terms. YOU AND YOUTUBE AGREE THAT ANY CAUSE OF ACTION ARISING OUT OF OR RELATED TO THE SERVICES MUST COMMENCE WITHIN ONE (1) YEAR AFTER THE CAUSE OF ACTION ACCRUES. OTHERWISE, SUCH CAUSE OF ACTION IS PERMANENTLY BARRED.

**Dated: June 9, 2010**

EXHIBIT   D

Bruce: I mean, I don't have, I don't have any income at all from any business or anything like that.

Mr. Simons: Right. Well, the thing is, is um, it seems that it was set up; there's a comment on the screen here with your last name, business-to-business consulting. Now, I'm not sure if that, you know, you're saying that a business-to-business consulting you're doing Internet, you're trying to start an Internet Marketing business, right?

Bruce: Yes that's correct.

Mr. Simons: Ok. So I don't know if the business-to-business consulting, where that came from. Maybe it is.

Bruce: Well, marketing is a consulting thing.

Mr. Simons: Ok. So you know, when you're on unemployment, it becomes something that we need to ask you about, because its, we're talking about availability for work.

Bruce: Yes.

Mr. Simons: Ok. So we're looking at the availability issue. Because when you're on unemployment, you need to be able and available for full time work without any restrictions.

---

From: "Kristi M. Howell-Ikeda" <khowell-ikeda@bccoc.com> 
Subject: RE: Membership Question
Date: April 14, 2011 10:43:23 AM EDT
To: "Jody Raines" <Jody@WebMarCom.net>

Hi Jody

It's good to hear from you.  I hope all is well.  Mr. Aristeo is not a member, never has been.  He has never even attended an event in the last 8 years.

I'm so glad you are interested in BCCOC.  I've attached the brochure & the application.  I'll add you to our email list for 90 days.  Please let me if you need anything else from us.

Best

Kristi

*Kristi M. Howell-Ikeda*
*President /CEO*
*Burlington County Chamber of Commerce*
*100 Technology Way, Suite 110*
*Mount Laurel, NJ 08054*
*856-439-2520 ext. 103*
*856-439-2523 (fax)*
*www.bccoc.com*

From: Jody Raines [mailto:Jody@WebMarCom.net]
Sent: Tuesday, April 12, 2011 5:02 PM
To: Kristi M. Howell-Ikeda
Subject: Membership Question

Good afternoon, Kristi,

I am interested in membership information in the Burlington County Chamber.  My concern is that I have a TRO against a person who has threatened me, and I want to be sure he isn't a member of the Burlington County Chamber already.

The person I have a temporary restraining order against is: Bruce Aristeo.  His company may be known by several names:

Aristeo B2B Consulting
Aristeo B2B Communications
Aristeo Enterprises
Ab2bc.net
Black Hat Enterprises
DXine

The company is located in Marlton, Moorestown or possibly Mt. Laurel.

There may be other corporate names or locations that I am not aware of.

Please let me know whether he is a member, and if so, I won't join.  If he isn't a member, could you share membership information with me?

Thanks in advance,

Jody

**Jody Raines**
Jody@WebMarCom.net
856.217.8341 (mobile)

CCPO/1300350505/00000088

# EXHIBIT  E

Art Campbell <art@camdencountychamber.com>            March 29, 2011  12:20 PM
To:  Bruce Aristeo
RE: Being Asked to Not Attend
_____

Dear Bruce:
Thank you for agreeing not to attend today's Social Networking Presentation.
As I indicated in our telephone conversation yesterday, one of our 4
panelists-Jody Raines-had indicated that because of issues that existed
between you and her; your presence at the event would cause her enough
distress that she would be unable to present as a panelist.

My request that you reconsider attending was made out of concern for the
conduct of an event that advertised 4 panelists and the expectations of the
other attendees that we were presenting what we offered.

The request was not intended to restrict your ability to attend events as a
member or in any way restrict your access to full member benefits.

I had instructed my registration staff last evening to admit you and a guest
at the pre-registration price if you did decide to attend.

Your decision to defer attending is appreciated.

Sincerely,
Art Campbell
President/CEO
Camden County Regional Chamber of Commerce

-----Original Message-----
From: Bruce Aristeo [mailto:bruce@ab2bc.net]
Sent: Monday, March 28, 2011 5:21 PM
To: art@camdencountychamber.com
Subject: Being Asked to Not Attend

Dear Arthur C. Campbell,

Thank you for calling me back today, you were very professional and most of
all understanding. Please accept my apologies for documenting our
conversation, my only intension is to protect myself from Jody Raines and
her attempts at harassment. I honorably chose not to attend based on your
request, and because I have no intention to cause discomfort to panelists or
to disrupt your presentation.

My request:
Please reply to this email with the reasons and details that Jody Raines has
discussed with you to cause the request for me not to attend. This is so
that I have documentation of what transpired. In addition, please include my
reply to you and my willingness to honor your request.

I suggest that a copy of the email also be sent to Ms. Raines.

Thank you for your understanding and I'm sad that you were forced in the
middle of this issue.
Bruce Aristeo

········

I received a call today from Rita Owens at approximately 1:28PM on 3/28/11
stating that my attendance fee for the Panel Presentation: Social Networking
From the Experts was refunded and that you asked me NOT to attend.

I told Rita that I would appreciate a call from you to understand what the
issue is. I have an inbound marketing business and wish to network and
promote my business through the chamber. I find it very disturbing that I
was asked not to attend.

·········

Bruce Aristeo
bruce@ab2bc.net
856.261.4543 (mobile)

www.ab2bc.net
Social Media Marketing - Internet Marketing - Web Design



Chrome   File   Edit   View   History   Bookmarks   Window   Help                 (100%) Fri 1:40 PM

New Tab   |   South Jersey Business Netwo

www.meetup.com/southjerseymeetup/

Buy/Sell   College   Financial   MacUpdate   Movies   NPR   Ship   Web Stuff   NJHire   MAXTOR   HubSpot   Marketing Tools   UIBC   Grasshopper   Other Bookmarks

**Find** a Meetup Group   **Start** a Meetup Group   **Sponsor** Meetup Groups

Bruce Aristeo   What's new   Help   My Groups ▾   Account   Log out

# South Jersey Business Networking Group

Home   Members   Sponsors   Photos   Pages   Discussions   More ▾                 **Join us!**

### This group's content is available only to members

## Welcome! Join NOW!

**Sicklerville, NJ**
Founded Feb 11, 2008

South Jersey Business Networking Group is only for serious business professionals. Our group is designed to help you grow your business through the power of building relationships. SJBNG hosts various events geared towards helping you build your business.

| | |
|---|---|
| Professional Networkers | 177 |
| Group reviews | 15 |
| Upcoming Meetups | 2 |
| Past Meetups | 23 |

Our events are a great platform for you to promote your services/products, meet new business professionals and build your network that will help you achieve your goals.

This group is GREAT for Business Owners, Managers and Professionals alike.

Learn more about this Meetup Group

Check out Our Sponsors and Perks.

**What members are saying!**

❝ Any group involving Andrew Young is always good:-) ❞

—Meetup Group member

❝ Andrew got out the shock paddles and brought this group back to life. ❞

—Meetup Group member

Organizers:
Andrew Young, Bill Silverman, Dawn Wolfe, Josh

Members can add Meetups

✉ Contact us

## You are prohibited by the Organizer from joining this Meetup Group.

**Sponsors and Perks**

TruBlu
Comfort Care

Event Sponsor

EXHIBIT   F

# *i*NTELYS*i*S

## BACKGROUND SCREENING REPORT
### BRUCE ARISTEO
Confidential

April 1, 2011

| OUR REF: | 311101 | | |
|----------|--------|--|--|

**SUBJECT PARTICULARS**

| SURNAME: | Aristeo |
|----------|---------|
| GIVEN NAME: | Bruce |

### CRIMINAL RECORD SEARCH

Statewide felony and misdemeanor searches using the subject's name and date of birth were conducted in the States of New Jersey and Pennsylvania. The results of the Pennsylvania searches were returned clear. The results of the New Jersey searches were not available at the time of this report. A supplemental report will be produced upon receipt of the information.

We conducted county-level felony and misdemeanor searches using the subject's name and date of birth in Philadelphia (back to October 1984) and Bucks (back to November 1987) Counties, Pennsylvania. Felony level searches were conducted in the following New Jersey Counties: Burlington (back to march 1991); Gloucester (back to July 1982); and Salem (back to July 1982). The results were returned clear.

### FEDERAL BANKRUPTCY SEARCH

A search of US Federal Bankruptcy Court records using the subject's name and his SSN, surfaced one record relating to him:

An October 1993 Chapter 7 Voluntary Bankruptcy Petition filed in the US Bankruptcy Court for the District of New Jersey by the subject and Miriam Aristeo. The Bankruptcy was discharged on March 9, 1994 and terminated on March 16, 1994.

A copy of the docket report is attached.

Intelysis Corp.
www.incelysis.com
856.429.0325
© 2011

---

# *i*NTELYS*i*S

Jody Raines
PO Box 891
Voorhees, NJ  08043
United States

Tel. 856.429.0325
Toll Free 888.610.8783
Fax 856.429.0539

Address 15 Mechanic Street
Haddonfield, NJ 08033
United States

www.incelysis.com

April 4, 2011

### Invoice

| Our File Ref: | 311101 | Invoice No: | U-11-04-339 |
|---------------|--------|-------------|-------------|
| File Name: | Aristeo | Client Number: | 58582 |

| To: | Investigation of Bruce Aristeo. | |
|-----|---------------------------------|--|
| | **Our Fee:** | 245.00 |
| | **NJST:** | 17.15 |
| | **Amount Due:** | **US $ 262.15** |

**Terms: Payment Due upon receipt**
**Our EIN: 52-2101793**

Thank you for referring this matter to us, we appreciate your business

Page 1 of 1

Deb Ferguson

**From:** Deb Myerson [dmyerson@intelysis.com]
**Sent:** Thursday, March 17, 2011 4:05 PM
**To:** 'Eileen McCartney'
**Subject:** RE: Verification of Mini-MBA in Social Media Marketing

**Tracking:**

| Recipient | Read |
|---|---|
| 'Eileen McCartney' | Read: 3/18/2011 8:28 AM |

Thank you so much Eileen. I will wait for the follow-up regarding your contact within Rutgers and I appreciate your help to this point.

Have a great day!

Deb

---

**From:** Eileen McCartney [mailto:emccartn@cmd.rutgers.edu]
**Sent:** Thursday, March 17, 2011 3:59 PM
**To:** 'Deb Myerson'
**Subject:** RE: Verification of Mini-MBA in Social Media Marketing

Deb:
We don't use social security number for our participants. We're in our 3rd running of the social media Mini MBA. I have coordinated all three and he's not in our registration system or on any attendance or sign in sheet. We have a separate program where we put completers of our programs with the date they completed. He's not even listed in that program.

If he took another "social media program" within Rutgers he wouldn't be in our database. That's why I reached out to our contact within Rutgers who handles the registration system for other programs. If he's taken something else with the words social media in it and registered through Rutgers she should have that information.

I can state that he didn't take the Mini MBA: Social Media program.
Eileen

---

**From:** Deb Myerson [mailto:dmyerson@intelysis.com]
**Sent:** Thursday, March 17, 2011 3:55 PM
**To:** 'Eileen McCartney'
**Subject:** RE: Verification of Mini-MBA in Social Media Marketing

Hi Eileen,

He actually claimed the social media marketing program. Is that the same program? Would it be possible that it would match a social security number as opposed to his name? If so, I do have that information.

Thank you for your help.

Deb Myerson

---

**From:** Eileen McCartney [mailto:emccartn@cmd.rutgers.edu]
**Sent:** Thursday, March 17, 2011 3:40 PM

1

---

**To:** 'Deb Myerson'
**Subject:** RE: Verification of Mini-MBA in Social Media Marketing

Deb:
We have no record of Bruce Aristeo taking our Mini MBA: Social Media program. I've reached out to our contact at Rutgers to see if he's registered in a different social media program within Rutgers. As soon as I hear back from her I'll let you know.

Please feel free to contact me should you require anything further.
Eileen

*Eileen A. McCartney*
Program Coordinator
Center for Management Development
Rutgers, The State University of New Jersey
94 Rockafeller Road, Suite 215
Piscataway, NJ 08854
Tel: 848.445.5529
Fax: 732.445.5665
emccartney@cmd.rutgers.edu
www.cmd.rutgers.edu

---

**From:** Deb Myerson [mailto:dmyerson@intelysis.com]
**Sent:** Thursday, March 17, 2011 1:55 PM
**To:** emccartney@cmd.rutgers.edu
**Subject:** Verification of Mini-MBA in Social Media Marketing

Hello Ms. McCartney.

My name is Deb Myerson and I spoke with you about verifying Bruce Aristeo's completion of the Rutgers mini-MBA in Social Media Marketing. I do not have a release for Mr. Aristeo, however, he was a sub-contracted employee of my client. We are conducting an investigation and are therefore attempting to verify the credentials he had provided as a sub contractor. Any help you can provide would be greatly appreciated.

Thank you for your help.

Sincerely,

Deb Myerson
*Deb Myerson| Paralegal| Intelysis | 15 Mechanic Street | Haddonfield, NJ | 08033*
℡*Phone: 856.429.0325 x227*
☏*Toll Free: 1.888.610.8783 x227*
🖷*Fax: 856.429.0539*
*Web: www.intelysis.com*
*Providing critical information that enables sound business decisions*
*due diligence digital forensics employment screening forensic accounting investigations*
*Twitter: http://twitter.com/jerzeydeb*
*Twitter: http://twitter.com/intelysiscorp*
*LinkedIn: http://www.linkedin.com/in/dmyerson2005/*
*Blog: http://intelysiscorp.blogspot.com/*

2



0064

# EXHIBIT  G

Reviewed by: _____
Date: _____

1
2 STATEMENT OF:             Deborah Ferguson
3
4 CASE NO.:                 13-3505
5
6 DATE:                     Wednesday, June 12th, 2013
7
8 TIME:                     Approximately 1020 hours
9
10 PLACE:                   Confidential
11
12 TAKEN BY:                Investigator Chris Auletto
13
14 PRESENT:                 Investigator Mike Snyder
15
16 TRANSCRIBED BY:          Dottie Farrell
17                          Camden County Prosecutor's Office
18
19 TRANSCRIPTION DATE:      August 13, 2013
20
21
22
23
24 Q.    This is the statement of Deborah Ferguson taken by Investigator Chris
25 Auletto of the Camden County Prosecutor's Office, taken at, this statement is
26 commencing at 1020 hours on Wednesday, June 12th, 2013. Ah, for the record
27 we're gonna keep Miss Ferguson's look, address and personal information
28 confidential on this statement. Ah, present during this statement is Investigator
29 Mike Snyder from the Camden County Prosecutor's Office. Um, Deborah, I'm
30 Investigator Auletto of the Camden County Prosecutor's Office and I'd like to ask
31 you some questions regarding an incident between Bruce Aristeo and Jodie
32 Raines. This is Camden County Prosecutor's case number 13003505. Are you
33 willing to make a voluntary and truthful statement about this matter?
34
35 A.    Yes, I am.
36
37 Q.    And you swear or affirm that anything you say is the truth, right?
38
39 A.    Yes.
40
41 Q.    Okay? Can you state your name for me?
42
43 A.    Deborah Ferguson.
44
45 Q.    And can you spell that for me?
46

1 A.    D E B O R A H   F E R G U S O N
2
3 Q.    Okay.  And for the record, like I said, we're gonna keep all of your
4 information confidential.  So okay, Deborah, can you explain to me in your own
5 words what knowledge you have ah of a case we have involving Bruce Aristeo
6 and Jodie Raines?
7
8 A.    Well Jodie came to me um as a, a um Corporate Find Investigator to
9 investigate Bruce's background in regarding litigation that, that ah was personal
10 and business in natural.  They, they had dated and um had a business
11 arrangement as will.  And she came to us I believe at the point where he has
12 started to really harass her.  I had to find out what was in his background and
13 how many things were true and false.  So ah, at that time that was the first
14 knowledge I really had of Bruce.  I knew she had dated somebody but I didn't
15 really have a lot of details before that.  Um, and that was the first, the first
16 encounter that I had dealing with Bruce.
17
18 Q.    Okay.  What happened from there?
19
20 A.    Ah, well we conducted the research and found that he had been in
21 litigation from other girlfriends, had, had ah basically started businesses
22 emulating what they were doing and, and then trying to steal clients and things
23 like that and had been in the same situation previous times, had found out that
24 he had lied about his Master's Degree and that it wasn't that, that he didn't have
25 a Master's Degree.  Um, and that's just generally was kind of a fraudster in, in
26 many ways.  Ah, we provided Jodie with a copy of the report and at once it was
27 out of our hands, that was the end of it.  We, you know, we sent her a bill and
28 that was that.  Um, Jodie informed me that he was still harassing her.  There
29 were still several litigation issues going on, back and forth, and he had at, at
30 several points Jodie had called me just to, to tell me that he had um ah, had, had
31 her arrested I believe.  Had um, had tried to have her daughter arrested.  Ah, it's
32 just many harassing things over and over again.  Um, and that she had been in
33 and out court with him.  Um, one, we knew of a restraining order and I was part
34 of the Rotary Club and . . .
35
36 Q.    Which Rotary Club was that?
37
38 A.    The, the Garden State Rotary Club where Jodie is a member and several
39 other people are members.
40
41 Q.    Does that meet somewhere?
42
43 A.    Ah, it meets at Ponzio's on Fridays at noon.
44
45 Q.    Okay.
46

1  A.    Um, and . . .

2

3  Q.    Is that every Friday?

4

5  A.    Every week.  Ah, fifty out of fifty two weeks a year.  And ah he was, we
6  knew of the restraining order and he wasn't suppose to be at any of these kind of
7  events.

8

9  Q.    Was he already in the Rotary or did he join or what happened?

10

11 A.    He had, he had gotten close with our, the Garden State Rotary Club's ex-
12 president ah named, am I allowed to say?

13

14 Q.    Sure.

15

16 A.    Okay.  Um, named ah Toby Cotch.  And Toby Cotch had split from our
17 Rotary Club to um, to start her own Rotary Club ah that met in the evenings.  And
18 Bruce joined that Rotary Club.

19

20 Q.    Know the name of that or  . . .

21

22 A.    Ah, The Twilight Club of Cherry Hill.

23

24 Q.    Okay.

25

26 A.    They meet at Dublin's Square, um and I don't, I think Tuesday nights but I
27 don't know all the details.  Um, and actually the way that Bruce came tó know
28 about who I was, Jodie took my report on her own will and handed it to Toby
29 suggesting that here's all the information that I hired Deb to find.  Um, he's not a
30 good person, I don't think he's Rotary material ah because Rota, Rotarian's are
31 suppose to be the best of the best.  Um, and Toby took the report, allegedly, I, I
32 don't, I wasn't there but from what I understand Toby took the report and showed
33 Bruce the report, which obviously had my company's information on it and
34 whatnot.  Um, and still allowed Bruce to become part of the club.  So I was, there
35 was several attempts for Bruce to come to the club and the first time, if I
36 remember correctly, and it's a little hazy, they start to run in together but if I
37 remember correctly, the first time he tried to come we, Michelle Moken and I
38 informed, Jodie wasn't there, but informed the Board that he shouldn't have been
39 allowed to be there.  And as a result the, they didn't have a copy of the
40 restraining order so they let Bruce  . . .

41

42 Q.    When was this at and where was it?

43

44 A.    I don't remember exactly when but it was at the Ponzio Meeting.

45

46 Q.    Oh, Ponzio's meeting, okay.

3

# EXHIBIT   H

Reviewed by: _____
Date: _____

1
2  STATEMENT OF:            Joe Colozzi
3
4  CASE NO.:                13-3505
5
6  DATE:                    Wednesday, June 12ᵗʰ, 2013
7
8  TIME:                    Approximately 1414 hours
9
10 PLACE:                   Camden County Prosecutor's Office
11
12 TAKEN BY:                Investigator Chris Auletto
13
14 TRANSCRIBED BY:          Dottie Farrell
15                          Camden County Prosecutor's Office
16
17 TRANSCRIPTION DATE:      August 9, 2013
18
19
20
21
22 Q.    This is the statement of Retired Sergeant Joe Colozzi, taken by
23 Investigator Chris Auletto of the Camden County Prosecutor's Office, taken at the
24 Prosecutor's Office.   This statement is commencing at 1414 hours on
25 Wednesday, June 12ᵗʰ, 2013. Sergeant Colozzi, I'm Investigator Auletto of the
26 Camden County Prosecutor's Office and I'd like to ask you some questions
27 regarding ah several incidents between Bruce Aristeo and Jody Raines.  This is
28 Camden County Prosecutor case number 13003505. Ah, do you swear or affirm
29 that everything you're about to tell me is the truth?
30
31 A.    I do.
32
33 Q.    Okay.  What is your name and could you spell it for me please?
34
35 A.    Ah, my first name is Joseph, my last name is Colozzi.  C O L O Z Z I.
36
37 Q.    Okay.  And for confidentiality purposes we're not gonna be um, I'm not
38 gonna ask you your address or any other personal information.  So can you
39 describe to me in your own words what knowledge you have um of this case
40 between Jodie Raines and Bruce Aristeo?
41
42 A.    Um, about two and a half, three years ago I met Jody Raines ah matter
43 through a motor cycle ah people cause we ride motor cycles together.  Ah, she
44 reached out to me to talk to me about a problem that she had cause she know
45 that I was law enforcement and ah I would be able to steer her in that direction.
46 And then she ah talk to me about the issue with this Bruce Aristeo ah guy.  And

1 now we talked about it and she was in the process at that time of getting a
2 restraining order against Mr. Aristeo.   And ah, she had issues with him.
3 Apparently she dated him, she told me she dated him for three months, met him
4 at one of these internet website meeting type places.  And ah, she said that after
5 three months she determined that he was creepy.  Um, her daughter didn't like
6 him.  And so she said she tried numerous times nicely to basically get away from
7 him and he refused.
8
9 Q.    Did she give you any like specific details, like what made him creepy?
10
11 A.    Ah . . .
12
13 Q.    Do you remember?
14
15 A.    Yeah, she said that one time that she came home from work and he was
16 actually in her house.
17
18 Q.    Okay.  And without her permission?
19
20 A.    Without her permission.
21
22 Q.    Okay.
23
24 A.    Apparently he had the ah code to her garage or he had a garage door
25 opener that he had taken and got into her garage and then consequently got into
26 her house.
27
28 Q.    Okay.  All right, so go ahead.
29
30 A.    Ah, so ah she said that he wouldn't leave her alone.  He would show up
31 um numerous times to do odds and ends around her house which she never
32 asked him to do.  Um, he also said that ah he, Jodie had owed her, him money
33 for work that he did on a website which um, did some work apparently ah, ah,
34 then I, I'm not sure, sure with the details but apparently he tried to sue Jody.
35
36 Q.    Okay.
37
38 A.    Ah, Jodie had an attorney ah make a letter ah "Cease and decease" from
39 any kind of contact.  And then he had ah tried to sue her civilly for money.  And
40 ah, she had showed me a court order and um, basically it was dismissed by
41 Judge, I think Glaskin stating that it was furiously.  Ah, I met with Jodie ah in a
42 Starbucks and she showed me different e-mails and paperwork that she had ah
43 involving Mr. Aristeo with messages back and forth.  And some of the messages
44 I mean that they were disturbing.  Um, and then it was probably, probably from
45 when all this happened, ah probably a year and a half later ah she had signed,
46 well before that she had signed harassment complaint along with a restraining

1  order.  And ah, probably a year and a half later for some unknown reason, the
2  harassment complaint was never even heard.  And then ah he came out with this
3  group of videos, this Band aid Justice, which involved my picture on there
4  because I had accompanied Miss Raines to court.
5
6  Q.      Did he say anything specific about you on that, you remember?
7
8  A.      No, it was just a picture and some statements.  He really didn't mention
9  my name or talk about me.
10
11 Q.      Okay.
12
13 A.      Um, my picture, obviously he got my picture off of ah Facebook cause I
14 was friends with Jody on Facebook.
15
16 Q.      All right.
17
18 A.      So he was able to obtain my picture and he posted it on the internet.  Ah,
19 he also came to my work ah and wanted to sign official misconduct charges
20 against me stating that I only went to court to intimidate and ah, use my position
21 to influence the judge and the prosecutor.  Um, obviously that was not the case.
22 Ah, I did not go to court in uniform.  I didn't acknowledge to anyone there who I
23 was.  I just sat in the back and, and ah we had left court.  I know one day we had
24 left court ah in Voorhees and um, he went out before her and I was with Miss
25 Raines that day and ah we stood and observed and he actually leaned against
26 his car, which was parked right next to her car when he had a restraining order in
27 effect and we waited a good twenty five or thirty minutes before he left cause he
28 knew she wasn't coming out.  So.
29
30 Q.      Okay.  And have you seen these other videos he's made Monkeycom?
31
32 A.      I have seen the Moneycom videos.  Um, I recently observed the video ah
33 involving her dog, which was disturbing.
34
35 Q.      And which one is that?
36
37 A.      Ah, the one where he basically is eating the meat and he's ah insinuating
38 that's her dog that she has.
39
40 Q.      Okay.  All right.  And um, I'm sure, I have a, we have another website that
41 he created called Domestic Stupidity where that's your pap, picture from ah the
42 website when he says some other things about you here.  Have you seen this
43 one?
44
45 A.      Ah, I have seen that one briefly.  Ah, I haven't really scanned through it to
46 see what information's about me on there.

3

1
2  Q.      All right.
3
4  A.      Ah . . .
5
6  Q.      And so you never had, did he ever speak to you directly?
7
8  A.      He's never spoke to me, ever.
9
10 Q.      Never reached to you like on e-mails or tweeter or any of that, things like
11 that?
12
13 A.      Nothing like that.
14
15 Q.      Okay.
16
17 A.      The only thing that he ever did was he attempted to have me fired from my
18 job.
19
20 Q.      From Burlington Township Police, right?
21
22 A.      Yes.  Yes.
23
24 Q.      All right.  (Inaudible) anything further you'd like to add to this statement?
25
26 A.      I have, just I've, I've seen the videos he's posted.  He's definitely a
27 dangerous person.  There's no doubt and he's tormented this woman to death.
28
29 Q.      Okay.
30
31 A.      That's, that's it.
32
33 Q.      All right.  Have any threats or promises been made to you to give this
34 statement?
35
36 A.      No.
37
38 Q.      Has this statement been given voluntarily of your own free will?
39
40 A.      Absolutely it has.
41
42 Q.      And have the answers you have given been true and correct to the best of
43 your knowledge?
44
45 A.      Yes, they have.
46

4

EXHIBIT  I

All Municipal Court Actions and VOR actions against Jody Raines are to be dismissed with prejudice including, but not limited to, matters presently pending in Burlington County. Bruce Aristeo will fully cooperate with the Prosecutor's Office with regard to the dismissal of the actions pending against Jody Raines.

The Temporary Restraining Order against Jody Raines shall be dismissed by Mr. Aristeo.

All Municipal Court actions against Bruce Aristeo are to be dismissed with prejudice including, but not limited to, matters presently pending in Burlington County. Ms. Raines will fully cooperate with the Prosecutor's Office with regard to the dismissal of the actions pending against Bruce Aristeo.

Both parties agree to not make any disparaging or derogatory comments about the other or to set about on a campaign to malign the other in such a way as to impair either party's business relationship or to limit the other party's ability to continue doing business in the Philadelphia/South Jersey market.

Neither party shall bear the legal fees of the other party for either the present actions before the Honorable Nan S. Famular, J.S.C. or any of the past or present Municipal Court actions pending or adjudicated.

Moving forward, the Honorable Nan S. Famular, J.S.C. shall preside over any future Court actions arising in the Superior Court, Camden County with regard to either party's breach of the foregoing agreement as to which locations, be they cyber or physical, either party may visit, join or participate with the purpose of conducting business, networking or training.

There shall be an entry of an Indefinite Temporary Restraining Order in lieu of a disposition on the merits.

Defendant may not attend any business and/or networking meeting at a physical location where anticipated attendance is less that 50 people.

This Indefinite TRO can only be dismissed by the Plaintiff.

will not attend any meetings at:
① Camden State Rotary Club
② Camden County Chamber of Commerce
and its affiliates (anything under its umbrella)

Jody Raines

Dina Capano

Bruce Aristeo

Krista Tirani

# EXHIBIT   J

# Township of Evesham

984 Tuckerton Road  •  Marlton  •  NJ 08053  •  856-983-2900

Municipal Court
Karen J. Caplan, Judge
Kim Fullerton, Court Administrator
Phone - (856) 983-2929  •  Fax - (856) 985-6007

August 23, 2012

James Conley, Esq.
Helmer, Paul, Conley and Kasselman
111 White Horse Pike
Haddon Heights, New Jersey 08035

RE: Bruce Aristeo

Dear Mr. Conley,

This office is in receipt of your correspondence dated August 22, 2012 requesting information on the above named individual.

As we have stated to your office in three phone conversations, and to Mr. Aristeo when he appeared here in our office yesterday, there are no pending or disposed complaints issued against Mr. Aristeo. There is no record of a 'no probable cause' decision. So in other works, there is not record.

I hope this will satisfy your request.

Very truly yours,

Kim Fullerton, CMCA
Court Administrator



INDEPENDENCE  •  INTEGRITY  •  FAIRNESS  •  QUALITY SERVICE

**EXHIBIT B: page 2**



BRUCE ARISTEO
(856) 437-0778
STAPLES #0033
MARLTON SQUARE SHOP. CTR
701 W ROUTE 70
MARLTON  NJ 08053

8 LBS     1 OF 1
SHP WT: 8 LBS
DATE: 09 DEC 2014

SHIP  COURT CLERK
TO:  US COURTHOUSE
     400 COOPER ST

CAMDEN  NJ 08102-1570

 

NJ 081 9-06

UPS GROUND
TRACKING #: 1Z 5AR 416 03 0691 1690



BILLING: P/P

ISH 13.00N ZZP 450 57.5V 10/2014

 SEE NOTICE ON REVERSE regarding UPS Terms, and notice of limitation of liability. Where allowed by law, shipper authorizes UPS to act as forwarding agent for export control and customs purposes. If exported from the US, shipper certifies that the commodities, technology or software were exported from the US in accordance with the Export Administration Regulations. Diversion contrary to law is prohibited.
RAD RF 1114